UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JUAN BERNARDEZ,

                                  Petitioner,

                -against-

HAROLD GRAHAM, Superintendent,
Auburn Correctional Facility,

                                  Respondent.
-------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

11 Civ. 6463 (NSR)(JCM)

To the Honorable Nelson S. Román, United States District Judge:

Petitioner Juan Bernardez ("Petitioner" or "Defendant"), proceeding *pro se*, filed a writ

of habeas corpus pursuant to 28 U.S.C. § 2254 by papers dated September 6, 2011.  Petitioner

challenges his convictions for three counts of murder in the second degree, kidnapping in the

first degree, robbery in the first degree, and burglary in the first degree before the Honorable

Robert Neary, Justice of the Supreme Court in New York State, Westchester County (the "Trial

Court"), contending, *inter alia*, that the Trial Court erred in denying Petitioner's motions to

suppress, permitting reference to Petitioner's prior crimes at trial, and imposing an excessively

harsh or illegal sentence. By affidavit and memorandum of law filed on January 31, 2013,

Respondent Harold D. Graham, Superintendent, Auburn Correctional Facility ("Respondent")

opposed the petition.  For the reasons set forth below, it is respectfully recommended that

Petitioner's petition for a writ of habeas corpus be denied.

## I. BACKGROUND

### A. Criminal Activity

Petitioner and Samuel Saunders ("Saunders") were acquaintances. (Trial Tr. at 1025-26).[1] On January 3, 2007, Saunders and Petitioner travelled to Yonkers in Saunders' car to help Saunders collect upon a debt. (*Id.* at 1031-32). Saunders asked Petitioner to bring a gun, but Petitioner said he did not know where to get a gun. (*Id.* at 1030). After arriving at the residence of Dr. Leandro Lozada ("Lozada"), Saunders entered and, approximately 45 minutes thereafter, motioned for Petitioner to enter. (*Id.* at 1065-66). Inside, Petitioner found Lozada sitting in a chair, bound by duct tape. (*Id.* at 1066-67). At Saunders' direction, Petitioner taped Lozada's waist and legs to the chair. (*Id.* at 1066).

Saunders called Lozada's bank and forced him to transfer approximately $50,000 into Saunders' account. (Trial Tr. at 1067-70). Next, Saunders placed a pillowcase over Lozada's head and wrapped the pillowcase in duct tape. (*Id.* at 1072-73). Stepping into a hallway with Saunders, Petitioner noticed that Saunders had a gun. (*Id.* at 1073). After Petitioner told Saunders that he should not kill Lozada, Petitioner returned to the car. (*Id.* at 1073-74). Saunders emerged from the house approximately 45 minutes later carrying a laundry bag. (*Id.*). Lozada was later found dead on his bedroom floor, (*id.* at 759), with two gunshot wounds to the head, (*id.* at 1580), and evidence of injuries sustained as a result of blunt force trauma, (*id.* at 1580-81).

Police detectives found the laundry bag, a blood-stained towel, a black glove, and blood-stained cloth with duct tape in trash bins outside Saunders' residence. (Trial Tr. at 635-40). Petitioner's DNA matched DNA recovered from Lozada's dining room walls. (*Id.* at 1493-99).

---

[1] "Trial Tr." refers to the transcript of Petitioner's trial before the Trial Court, lasting from September 2, 2008 through September 15, 2008.

**B. Petitioner's Statements**

Within weeks of Lozada's murder, Petitioner, who was on probation in the Bronx, New

York, became a suspect. (Pre-Trial Hr'g Tr. [2] at 64-66).  Detective George Piedade ("Detective

Piedade") informed the office of the Bronx County Department of Probation that he wanted to

speak to Petitioner about an incident he was investigating. (*Id.* at 66, 191).  On February 9, 2007,

when Petitioner arrived at the Probation office to meet with Leann Melford ("Melford"), his

Probation Officer, Melford called Detective Piedade. (*Id.* at 305-308, 316-18, 322).  Detective

Piedade, accompanied by Detective Anthony Chiarella ("Detective Chiarella"), met Petitioner in

the Department of Probation's public waiting room and informed Petitioner that they were

investigating an incident that occurred in Yonkers. (*Id.* at 68-69).  Detective Piedade asked

Petitioner if he would go to the Yonkers police station, and Petitioner agreed. (*Id.* at 69).

Petitioner was not handcuffed, restrained, or searched by Detectives Piedade and Chiarella

("Detectives"). (*Id.* at 69-71).

At the Yonkers police station, Detective Piedade, Detective Chiarella, and Petitioner

entered an interview room. (Pre-Trial Hr'g Tr. at 76).  Petitioner was unrestrained. (*Id.* at 76, 89).

Detective Piedade then told Petitioner that he wanted to speak about Lozada's murder and read

Petitioner his *Miranda* rights from a pre-printed card. (*Id.* at 76).  The card read:

> You have the right to remain silent. Anything [you say] can and
> will be used against you in a court of law.  You have the right to
> talk to a lawyer and have him present with you while you are being
> questioned.  If you cannot afford to hire a lawyer, one will be
> appointed to represent you before any questioning, if you wish.
> You can decide at any time to exercise these rights and not answer
> any questions or make any statements.

---

[2] "Pre-Trial Hr'g Tr." refers to the transcript of the pre-trial hearing held in the Trial Court on January 3, 4, 7, and 8,
2008.

(*Id.* at 82). The word "waiver" was printed on the card as a caption, but Detective Piedade neither read that word to Petitioner nor explained its meaning. (*Id.* at 199-202). Detective Piedade asked if Petitioner understood those rights, and Petitioner stated that he did. (*Id.* at 76, 82). Detective Piedade then asked Petitioner to sign the *Miranda* warnings card. (*Id.* at 76-77). After looking at the card, Petitioner told Detective Piedade that he did not read English very well. (*Id.*). Detective Piedade told Petitioner that he had just read aloud what was written on the card. (*Id.*). Petitioner then signed the card. (*Id.* at 77-78).

Petitioner initially denied knowing anyone named Samuel Saunders, but after Detective Piedade stated that Saunders previously owned the building next to where Petitioner lived, Petitioner recanted, stating that he did in fact know Saunders. (Pre-Trial Hr'g Tr. at 84). Petitioner claimed he had not seen Saunders for several months. (*Id.* at 85). Detective Piedade then told Petitioner that he was in possession of a surveillance videotape from Petitioner's apartment building showing that Petitioner met with Saunders the morning of January 3, 2007, although Detective Piedade did not possess such a tape. (*Id.* at 85). Petitioner then admitted he had met with Saunders on that day, but only to drive him to a McDonald's restaurant around the corner. (*Id.*).

When the Detectives told Petitioner that they had cell phone records that could be used to identify a caller's location at the time calls were made, Petitioner stated that he went with Saunders to "the doctor's house" but claimed he did not go inside. (Pre-Trial Hr'g Tr. at 86). Detective Piedade asked Petitioner to provide a written statement, and Petitioner agreed. (*Id.* at 93-94). After reviewing Petitioner's statement, Detective Piedade told Petitioner that they had recovered items from Lozada's house with DNA samples, which could be used to prove whether

Petitioner stayed outside the house as he claimed. (*Id.* at 107-09). Petitioner then admitted he had entered the house. (*Id.* at 109-110).

After recounting many of the facts stated in the previous section, Petitioner agreed to repeat his statement in writing, and Detective Piedade re-advised Petitioner of his *Miranda* rights. (Pre-Trial Hr'g Tr. at 116). Detective Piedade typed Petitioner's statement and confirmed the contents with Petitioner. (*Id.* at 116-18). Detective Piedade then asked Petitioner to give a videotaped statement, and Petitioner agreed. (*Id.* at 124). On video, Detective Piedade re-advised Petitioner of his *Miranda* rights, and Petitioner acknowledged receiving *Miranda* warnings earlier in the day. (*Id.* at 224, 427).

Following Petitioner's questioning, Yonkers detectives obtained and executed a search warrant of Petitioner's apartment and discovered an unloaded .22 caliber revolver inside a mattress. (Trial Tr. at 670-76, 938-40). This weapon, however, was not used to kill Lozada. (*Id.* at 1660-61).

## C. Pre-Trial Hearing

The Trial Court held a pre-trial suppression hearing on whether Petitioner's statements were the product of an unlawful seizure in violation of the Fourth Amendment, whether his statements were given in violation of his Sixth Amendment right to counsel, and whether his statements were given involuntarily in violation of N.Y. C.P.L. § 60.45 and the Fifth and Fourteenth Amendments. The Trial Court denied Petitioner's suppression motions in full, holding that: (1) Petitioner was not detained in custody until after he made his inculpatory

statements; (2) Petitioner was properly mirandized; and (3) Petitioner's confession was

voluntary. (Pre-Trial Hr'g Tr. at 423-31).

## D. Trial

At trial, the defense presented Dr. Laurence S. Baker, a clinical psychologist, to testify

about Petitioner's mental state. (9/15/2008 Trial Tr.[3] at 29). Dr. Baker stated his opinion that

Petitioner was mildly mentally retarded, had difficulty reasoning and making considered

judgments, and could not likely perceive the consequences of actions. (*Id.* at 38, 43, 47, 48, 82).

To rebut this testimony, the Government presented Dr. Alan Tuckman, a forensic psychiatrist,

who testified that Petitioner had the capacity to formulate the intent to participate in the crimes of

murder, kidnapping, and robbery, given his prior criminal history, past awareness of *Miranda*

rights, and past decisions to invoke or waive his *Miranda* rights. (*Id.* at 236, 253, 271-72). The

Trial Court judge gave a limiting instruction prohibiting the jury from drawing an inference of

Petitioner's current culpability from the fact that he may have committed prior crimes. (*Id.* at

250-51, 258-59). On appeal, the Supreme Court of the State of New York Appellate Division,

Second Judicial Department ("Second Department") deemed this evidence, offered for the

purpose of rebutting Petitioner's evidence regarding his mental state, more probative than

prejudicial, especially in light of the Trial Court judge's limiting instruction. *People v.*

*Bernardez*, 901 N.Y.S.2d 699, 701 (2010).

When asked how he evaluated Petitioner's condition, Dr. Tuckman stated that he

reviewed various documents, including "a couple of records of his prior crimes," including

Peitioner's 2004 arrest, and Petitioner's "rap sheet." (9/15/2008 Trial Tr. at 249-50). Right after

---

[3] "9/15/2008 Trial Tr." refers to the transcript of Petitioner's trial in the Trial Court on September 15, 2008. The transcript for proceedings on that date is numbered separately from the transcript for proceedings on prior dates.

those statements, the Trial Court judge, in response to defense counsel's application, stated: "Ladies and gentlemen, you are not to infer from the testimony about prior crimes that the defendant had any propensity to commit the crimes in this case." (*Id.* at 250). After the Trial Court judge's instruction, Dr. Tuckman mentioned Petitioner's violation of parole, and the Trial Court judge re-delivered his limiting instruction to the jury. (*Id.* at 258-59).

## E.  Verdict and Sentencing

The jury found Petitioner guilty of: (1) three counts of felony murder in the second degree; (2) kidnapping in the first degree; (3) robbery in the first degree; and (4) burglary in the first degree, but not guilty of intentional murder. (9/15/2008 Trial Tr. at 457-58).  He was sentenced to terms of imprisonment of twenty-five years to life for the three felony-murder counts, twenty-five years with five years of supervised release for robbery, twenty-five years for kidnapping, and fifteen years plus five years of supervised release for burglary. (Sentencing Tr. [4] at 22-24).  All of these sentences were to run concurrently aside from the burglary sentence, which would run consecutively. (*Id.*).

## F.  Direct Appeal

Petitioner appealed to the Second Department arguing that: (1) he was unlawfully arrested and subjected to a custodial interrogation; (2) he did not knowingly, voluntarily, and intelligently waive his Fifth Amendment rights and that his confession was coerced; (3) the Trial Court judge improperly permitted testimony regarding Petitioner's past crimes, and that this was reversible error; and (4) the Trial Court judge's sentence was excessive. (Petition,[5] Ex. A) (Petitioner's appellate brief).  On May 25, 2010, the Second Department affirmed the Trial

---

[4] "Sentencing Tr." refers to the transcript of Petitioner's sentencing hearing on November 5, 2008.

[5] Refers to the Petition filed in this action on September 6, 2011. (Docket No. 1).

Court's judgment of conviction and rejected each of Petitioner's claims. *People v. Bernardez*, 901 N.Y.S.2d 699 (2010). On October 28, 2010, the New York State Court of Appeals ("Court of Appeals") denied Petitioner's application for leave to appeal. *People v. Bernardez*, 938 N.E.2d 1015 (2010).

## G. State Collateral Proceedings

Petitioner then collaterally attacked his sentence by bringing a motion in state court pursuant to N.Y. C.P.L. § 440.20. (Respondent's Ex.[6] U) (decision granting motion).  Petitioner argued that his sentence of consecutive terms of imprisonment was "illegal, invalid and unauthorized" because it violated N.Y. C.P.L. § 70.25, which requires that sentences for two acts that are not separate or distinct run concurrently. (*Id.*).  On June 7, 2011,  the Honorable Albert Lorenzo, Acting Justice of the Supreme Court in New York State, Westchester County, granted Petitioner's motion. (*Id.*).

On June 28, 2011, the People of the State of New York ("State") filed a motion to reargue, claiming that Justice Lorenzo's June 7, 2011 decision was incorrect because the Trial Court judge had discretion, as a matter of law, to choose whether the burglary and robbery sentences would run concurrently.  On July 22, 2011, Justice Lorenzo reversed his earlier decision, reinstating the Trial Court judge's original (consecutive) sentence. (Respondent's Ex. X).  On November 15, 2011, the State moved to withdraw its Notice of Appeal to the Second Department, (Respondent's Ex. Y), and on November 23, 2011, the Second Department granted the State's application and noted that it had not received "any papers in opposition or in relation thereto," (Respondent's Ex. Z).

---

[6] Refers to exhibits filed with Respondent's Memorandum of Law, filed in this action on January 31, 2013. (Docket No. 22).

**H. Federal Habeas Petition**

On September 6, 2011, Petitioner filed the instant petition for habeas corpus, *pro se*, (Petition), adopting the arguments he made in his counseled brief to the Appellate Division on direct appeal, (Petition, Ex. A). In his Amended Traverse, Petitioner also appears to argue that the Detectives' questioning was coercive given Petitioner's alleged mental retardation. (Am. Traverse[7] ¶¶ 7-9).

On January 31, 2013, the State opposed Petitioner's motion. On February 14, 2013, Petitioner sought appointment of counsel, which was denied by the Honorable George A. Yanthis, United States Magistrate Judge (retired), on March 7, 2013. On June 19, 2013, Petitioner filed his Traverse, which Petitioner amended on June 18, 2014.

## II. APPLICABLE LAW

The statutory authority of federal courts to issue habeas corpus relief for individuals in state custody is provided in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA constrains federal court review of state court determinations to those in which a person claims to be in custody in violation of "the Constitution or laws or treaties of the United States." AEDPA § 2254(a).

Because Petitioner is appearing *pro se*, he is entitled to special solicitude—meaning, his arguments will be liberally construed. *See Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).

**A. Exhaustion of State Claims**

AEDPA requires a petitioner to bring his claims in state court before seeking relief in federal court. AEDPA § 2254(b)(1)(A). A habeas petitioner must have "fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal

---

[7] Refers to the Amended Traverse filed in this action on June 18, 2014. (Docket No. 32).

courts." *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001) (quotation marks and citation omitted). Fair presentation includes petitioning for discretionary review in the state's highest appellate court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999). In New York, a petitioner must appeal a conviction to the Appellate Division, and then seek a certificate granting leave to appeal from the Court of Appeals. *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). If a petitioner has followed these steps for a given claim, that claim has been "exhausted" and can be brought in federal court.

A petitioner is not required to seek collateral relief in the state system. *O'Sullivan*, 526 U.S. at 844 (1999). If a petitioner brings a claim for collateral review in a state court, that claim is denied, and the petitioner fails to seek leave to appeal that denial, the claim is unexhausted, and therefore, unreviewable in federal court. *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990). However, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997). In such cases, the district court may deem the claims to be exhausted, but they are nonetheless procedurally barred from habeas review. *Id.* at 139-40 ("[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 (1991))).

When a petitioner brings unexhausted claims in a habeas petition, the federal court can: (1) stay the petition pending exhaustion of unexhausted claims; (2) dismiss the petition without prejudice; or (3) delete the unexhausted claims and proceed with the exhausted claims. *Rhines v. Weber*, 544 U.S. 269, 274-279 (2005). However, a claim is procedurally barred—and therefore

should be dismissed with prejudice—if the claim was not presented to the Court of Appeals and

no further relief is available in state court, *Galdamez*, 394 F.3d at 74, or if the claim was

exhausted in state court, but the state court resolved the claim on independent and adequate state

grounds, *Coleman*, 501 U.S. at 729-32.  Habeas review is only available for procedurally

defaulted claims if the petitioner can show that cause exists for failure to exhaust and prejudice

would result, or if a fundamental miscarriage of justice would exist if the claim were not

reviewed. *Id.* at 750.

      "An application for a writ of habeas corpus may be denied on the merits, notwithstanding

the failure of the applicant to exhaust the remedies available in the courts of the State." AEDPA

§ 2254(b)(2).

## B.  Standard of Review for Exhausted Claims

      AEDPA § 2254(d) provides that:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim—
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

AEDPA § 2254(d).  When confronted with a claim for habeas relief that was adjudicated in state

court, the federal court must first determine whether the claim was adjudicated on the merits and,

if so, whether the state court's adjudication falls under either of the two prongs of § 2254(d).

## III. DISCUSSION

A liberal reading of Petitioner's claims suggest that he is arguing that his conviction and sentence violated the Constitution in four ways: (1) he was unlawfully seized and subjected to a custodial interrogation at the police precinct in violation of the Fourth Amendment; (2) his waiver of his Fifth Amendment rights was involuntary, unknowing, or unintelligent and his confession was coerced; (3) the Trial Court violated his due process rights by permitting testimony referring to his past crimes; and (4) his sentence was excessively harsh or illegal in violation of the Eighth Amendment.  The following will address each claim in turn.

### A. Fourth Amendment Claim

Petitioner claims that he was arrested without probable cause in violation of the Fourth Amendment.

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 482 (1976).  A federal court can only review Fourth Amendment claims in a habeas petition when (1) "the state has provided no corrective procedures at all to redress the alleged [Fourth Amendment] violations" or (2) "the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (citations omitted).

Article 710 of N.Y. Criminal Procedure Law offers redress to criminal defendants by suppressing evidence obtained through illegal search or seizure in violation of the Fourth Amendment. N.Y. C.P.L. § 710.10 *et seq.*  Federal courts have found this law to be a facially

adequate corrective procedure. *Capellan*, 975 F.2d at 70 n.1.  Thus, Petitioner can only secure

relief for his Fourth Amendment claim if he was precluded from availing himself of the

protections of Article 710 due to an unconscionable breakdown in the underlying process.

Before trial, Petitioner filed a motion to suppress evidence flowing from his seizure and

his interview with the Detectives.  On January 3, 4, 7, and 8, 2008, the Trial Court held a hearing

on these claims.  During this hearing, three police officers involved in Petitioner's arrest and his

Bronx Probation Officer testified and were subject to cross-examination.  At the conclusion of

this hearing, the Trial Court found that the state's witnesses were "fully credible," and it denied

petitioner's motion to suppress. (Pre-Trial Hr'g Tr. at 423-31).  Furthermore, Petitioner appealed

his suppression claim to the Second Department, (Petition, Ex. A), and thereafter to the Court of

Appeals, (Respondent's Ex. I).  In both instances, he was represented by counsel.  The Second

Department fully addressed the Fourth Amendment issue and affirmed that the Trial Court

"properly found that the defendant did not make those statements during a custodial

interrogation, and that they were not the product of an unlawful arrest." *Bernardez*, 901 N.Y.S.2d

at 700.  Petitioner made this same argument in the Court of Appeals in his application for leave

to appeal, which was denied by that Court. (Respondent's Ex. I); *Bernardez*, 938 N.E.2d at 1015.

Petitioner did not have an unconscionable breakdown of the protections offered by

Article 710.  To the contrary, the New York state courts afforded Petitioner a full and fair

opportunity to litigate his Fourth Amendment claim.  Therefore, Petitioner's Fourth Amendment

claim should be denied with prejudice.

## B.  Fifth Amendment Claims

Petitioner claims that his statements to the Detectives were elicited in violation of the

Fifth Amendment for three reasons.  First, Petitioner claims that Detective Piedade omitted the

word "waiver"—a header from Detective Piedade's *Miranda* warnings card—and that therefore, Petitioner was improperly mirandized. (Petition, Ex. A at 30-33). Second, Petitioner argues that because he suffered from mental impairment, his waiver of his Fifth Amendment rights was involuntary.[8] (Am. Traverse ¶¶ 5-8). Third, he argues that his confession to the Detectives was coerced. (*Id.* ¶ 9). Petitioner attached an article from the New York Law Journal discussing a case in which the Court of Appeals held that psychological coercion employed by the police during a custodial interrogation rendered a defendant's confession involuntary. (*Id.* at Ex. A).

Petitioner's sole argument to the Court of Appeals regarding his Fifth Amendment claim was that *Miranda* warnings do not cleanse the taint of evidence obtained from an illegal seizure. (Respondent's Ex. I). Petitioner did not argue to the Court of Appeals that he was improperly mirandized, that his waiver was involuntary, or that his confession was coerced.

The State argues that Petitioner's Fifth Amendment claims are unexhausted and procedurally defaulted. Under New York law, defendants are permitted only one direct appeal and "only one application for leave to appeal to the Court of Appeals," *Roa v. Portuondo*, 548 F. Supp. 2d 56, 60 (S.D.N.Y. 2008); *see also Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 170 (2d Cir. 2000). Because Petitioner never raised these Fifth Amendment claims in his letter application to the Court of Appeals for leave to appeal from the Second Department, (*see* Respondent's Opp'n[9] at 20; Respondent's Ex. I), they are unexhausted. Because there is no procedure under New York law by which Petitioner can now raise these Fifth Amendment claims to the Court of Appeals, the claims are procedurally defaulted.

---

[8] Although the Court will not ordinarily consider arguments made for the first time in a Traverse or Reply, in affording Petitioner special solicitude due to his *pro se* status, the Court will review the arguments made in the Amended Traverse as if they were made in the Petition. *See Tracy*, 623 F.3d at 101.

[9] Refers to Respondent's Memorandum of Law filed in this action on January 31, 2013 (Docket No. 22).

If a claim has been procedurally defaulted, it can only be reviewed in federal court if the petitioner can show that cause exists for failing to exhaust *and* prejudice would result, or if a fundamental miscarriage of justice would exist if the claim were not reviewed. *Coleman*, 501 U.S. at 750. Here, Petitioner has not shown—nor does the record reflect—any such circumstances. "Showing cause for default requires a petitioner to put forth 'some objective factor external to the defense' which caused the claim not to have been previously raised." *Roa*, 548 F. Supp. 2d at 59 (citing *Gonzalez v. Sullivan*, 934 F.2d 419, 422 (2d Cir. 1991)). "Objective impediments to compliance with the procedural rules . . . include: 1) the factual or legal basis of a claim was not reasonably available to petitioner's counsel; 2) interference by officials made compliance impracticable; and 3) ineffective assistance of counsel." *Id.* (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

Here, Petitioner was represented by counsel on his application to the Court of Appeals. There is no indication that Petitioner or his attorney was unaware of the legal or factual basis of his claim or that officials improperly interfered. Additionally, Petitioner has not alleged that he was denied the effective assistance of counsel. Therefore, Petitioner's Fifth Amendment claims are procedurally defaulted and should be denied with prejudice.

## C. Due Process Claim

Petitioner argues that his due process rights were violated when the Trial Court permitted testimony from the State's witnesses, on rebuttal, which referenced Petitioner's prior convictions.[10]

---

[10] Given that Petitioner is *pro se*, this analysis interprets Petitioner's argument to implicate his federal constitutional rights. *See Tracy*, 623 F.3d at 101.

With regard to review of a state trial court's evidentiary rulings, the only question before the federal court is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citations and quotation marks omitted). Federal courts will "normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citations and quotation marks omitted). *See also Hernandez v. Senkowski*, No. CV 98-5270 RR, 1999 WL 1495443, at *17 (E.D.N.Y. Dec. 29, 1999) ("Rulings with respect to uncharged crimes or similar act evidence rarely [implicate federal due process] since federal and state trial courts enjoy considerable discretion in deciding when such evidence is properly placed before a jury.").[11]

At his trial before the Trial Court, Petitioner presented Dr. Baker, a clinical psychologist, who testified that Petitioner was mildly mentally retarded, had difficulty reasoning and making considered judgments, and could not likely perceive the consequences of actions. To rebut Dr. Baker's opinion, the State presented Dr. Tuckman, who testified that Petitioner had the capacity to formulate the intent to participate in the crimes of murder, kidnapping, and robbery, given his prior criminal history, past awareness of *Miranda* rights, and past decisions to invoke or waive his *Miranda* rights. The Trial Court gave a limiting instruction prohibiting the jury from drawing an inference of Petitioner's current culpability from the fact that he may have committed prior

---

[11] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) and Local Rule 7.2 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case, only available by electronic database, accompanies this Report and Recommendation and shall be simultaneously delivered to *pro se* Petitioner.

crimes. The Second Department deemed this evidence, offered for the purpose of rebutting Petitioner's evidence regarding his mental state, more probative than prejudicial, especially in light of the Trial Court's limiting instruction.

Here, given the limiting instruction and the weight of the evidence presented at trial, it cannot be said that Petitioner's conviction violates due process. Any error does not rise to the level of constitutional infirmity, as Petitioner's right to a fair trial was not compromised. Therefore, Petitioner's due process claim should be denied with prejudice.

## D. Eighth Amendment Claim

Petitioner argues that the Trial Court judge's sentence is excessively harsh and that imposing consecutive terms of imprisonment for burglary and robbery offenses is illegal.

Petitioner challenged his sentence on direct appeal and on state collateral attack. On direct appeal to the Second Department, Petitioner argued only that the sentence was excessively harsh. (Petition, Ex. A). In his counseled letter to the Court of Appeals seeking leave to appeal, Petitioner argued only that his sentence was illegal. (Respondent's Ex. I). Petitioner did not (1) rely on "pertinent federal cases employing constitutional analysis," (2) rely on "state cases employing constitutional analysis in like fact situations," (3) assert "the claim in terms so particular as to call to mind a specific right protected by the Constitution," or (4) allege "a pattern of facts that is well within the mainstream of constitutional litigation." *Daye v. Attorney Gen. of State of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982).[12]  Because Petitioner did not "fairly

---

[12] *See also Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011) ("[While] a state prisoner is not required to cite chapter and verse of the Constitution in order to satisfy [the fair presentation] requirement, still, he must present his challenge in terms that are likely to alert the [state] court[s] to the claim's federal nature.") (citations and quotation marks omitted) (third and fourth alterations in original).

present" his federal claim to the Court of Appeals, Petitioner's Eighth Amendment claim raised through direct appeal is unexhausted. *See Turner*, 262 F.3d at 123.[13]

On state collateral attack, Petitioner, *pro se*, successfully argued before Judge Lorenzo that his sentence of consecutive terms was illegal. (Respondent's Ex. U). However, on July 22, 2011, Judge Lorenzo reversed himself following the State's application for a rehearing, and reinstated the Trial Court judge's original sentence. (Respondent's Ex. X). Petitioner did not appeal the denial of his collateral review motion to the Second Department.

A petitioner has not fairly presented his federal claim to the New York courts unless he has brought that claim to the Court of Appeals.[14] *Galdamez*, 394 F.3d at 74. For Petitioner to exhaust his claims raised on state collateral review, he would have to first appeal to the Second Department and, if denied, raise an Eighth Amendment claim to the Court of Appeals, asking for leave to appeal the Second Department's decision.

Therefore, Petitioner's Eighth Amendment claim is unexhausted and should be dismissed with prejudice.

## IV. CONCLUSION

For the aforementioned reasons, I conclude and respectfully recommend that Petitioner's writ of habeas corpus be DENIED in its entirety.

## V. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts, the parties shall have fourteen (14) days from the

---

[13] Petitioner's federal claim based on his direct appeal of his sentence is also likely procedurally defaulted. Under New York law, defendants are permitted only one direct appeal and "only one application for leave to appeal to the Court of Appeals," *Roa*, 548 F. Supp. 2d at 60; *see also Spence*, 219 F.3d at 170.
[14] There is a limited exception when "it is clear that the state court would hold the claim procedurally barred." *Reyes*, 118 F.3d at 139. In such cases, the district court may deem the claim to be exhausted, but it is nonetheless procedurally barred from habeas review. *Id.* at 139-40.

18

receipt of this Report and Recommendation to serve and file written objections. If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d). Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Nelson S. Román at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Requests for extensions of time to file objections must be made to the Honorable Nelson S. Román and not to the undersigned. Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); *Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   November 3, 2015
         White Plains, New York

                                        RESPECTFULLY SUBMITTED,


                                        JUDITH C. McCARTHY
                                        United States Magistrate Judge

1999 WL 1495443
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Jose HERNANDEZ, a/k/
a Allen Gonzalez, Petitioner,
v.
Daniel SENKOWSKI, Superintendent,
Clinton Correctional Facility, Respondent.

Nos. CV 98–5270 RR, CV 99–
169 RR.   |   Dec. 29, 1999.

**Attorneys and Law Firms**

Jose Hernandez, Clinton Corr. Fac., Dannemora, NY,
Petitioner, pro se.

Honorable Richard Brown, Queens County District Attorney,
Kew Gardens, NY, By: Mark H. Levine, Assistant District
Attorney, for Respondent in 99–CV–5270.

Honorable Robert Johnson, Bronx County District Attorney,
Bronx, NY, By: Lisa I. Cuevas, Assistant District Attorney,
for Respondent in 99–CV–169.

*Memorandum and ORDER*

RAGGI, J.

**\*1** Jose Hernandez, sometimes also known as Allen
Gonzalez, is presently incarcerated serving a twenty-five
years to life sentence imposed in 1994 after a Queens jury
found him guilty of the contract murder of Santiago Seri.
When he completes that sentence, Hernandez will begin a
consecutive prison term of twelve and one-half to twenty-five
years imposed in 1995 for his efforts to murder the trial judge,
district attorney, and assistant district attorney involved in
his 1994 case. Hernandez has unsuccessfully pursued myriad
direct and collateral challenges to these convictions in the
state courts. He now petitions this court for writs of habeas
corpus pursuant to 28 U.S.C. § 2254 (1994 & Supp.1999). His
petition with respect to his 1994 conviction is docketed as 98
CV 5270. His petition with respect to his 1995 conviction is
docketed as 99 CV 169.[1]

A liberal reading of Hernandez's papers suggests that he
challenges his 1994 conviction on the following grounds:

(1) the evidence was insufficient to support a finding of
guilt beyond a reasonable doubt, (2) petitioner was mentally
incompetent to participate in his trial and sentencing, (3)
the trial court erred in failing to suppress post-arrest
statements secured in violation of petitioner's Fifth and Sixth
Amendment rights, (4) the court violated petitioner's Sixth
Amendment right to call witnesses in his own defense, (5)
petitioner was denied due process by the court's failure to
declare a mistrial after a prosecution witness testified to
uncharged bad acts, (6) the prosecutor's misconduct denied
petitioner his due process right to a fair trial, and (7) trial
counsel was constitutionally ineffective.

Hernandez asserts the following grounds for vacating his
1995 conviction: (1) the Queens County Supreme Court
lacked personal and subject matter jurisdiction over his case,
(2) the evidence was insufficient to support a finding of
guilt beyond a reasonable doubt, (3) petitioner was mentally
incompetent to participate in his trial and sentencing, (4) the
trial court erroneously admitted into evidence tape recorded
conversations procured in violation of petitioner's Sixth
Amendment and due process rights, (5) errors in the trial
transcript denied petitioner due process of law, (6) the
prosecutor's misconduct denied petitioner his due process
right to a fair trial, (7) trial counsel was constitutionally
ineffective.

The court has carefully considered the submissions of the
parties as well as the record of proceedings in the state courts
relating to both of the challenged convictions. For the reasons
stated herein, the court finds that petitioner's claims are either
procedurally barred or lacking in merit. Accordingly, both
petitions are denied.

*Factual Background*

**1. The 1994 Conviction**
On May 21, 1992, petitioner, Jose Hernandez drove Santiago
Seri to Highland Park in Queens and there shot him dead. The
murder was a contract execution, and Hernandez's culpability
at trial was established through the testimony of his common-
law wife and accomplice, Rachel DeJesus; petitioner's own
post-arrest statement; and the testimony of various civilian
and law enforcement witnesses.

**a. The Murder of Santiago Seri**

1999 WL 1495443

**\*2** Rachel De Jesus, who testified pursuant to a plea agreement, stated that on May 20, 1992, Hernandez had told her that someone would be coming to their home to drop off $10,000 as payment for a "hit." The next day, she saw Hernandez meet with three men, after which she and petitioner got into a beige station wagon and drove to Jamaica Avenue in Queens where they found Santiago Seri. Ms. DeJesus heard Hernandez tell Seri that he knew where the guys were who had the money. Seri got into the car with Hernandez and Ms. DeJesus, and the trio drove to Highland Park in Queens. There Hernandez shot and killed Seri with a nine-millimeter gun that he routinely carried. Petitioner and Ms. DeJesus fled the scene in a white Firebird driven by unapprehended accomplices, "Bebe" and "Benji." When they arrived home, Hernandez told Ms. DeJesus to have their neighbor, Ludovina Nunez, cut her waist-long hair very short. Hernandez also had Ms. Nunez cut his hair, after which he dyed it an orange-blond.

Four people who happened to be in Highland Park on May 21, 1992, heard the shot that killed Santiago Seri. Omaira and Hector Nieves testified that when they turned in the direction of the sound, they saw a man armed with a pistol and a woman exit a beige station wagon. The two got into a nearby white car, which drove out of the park. Co-workers Darrell Dotson and Anthony Campbell made similar observations. Campbell testified that he saw a man holding an automatic gun and a woman getting out of a brown car. Dotson also saw the armed man and the woman as they got into the back seat of a white car that quickly drove away. Thereafter, Dotson approached a station wagon that was parked with its door open. Inside, he found the dead body of Santiago Seri, with blood pouring from the head.

A forensic pathologist would testify that Seri was struck by a single bullet from a gun fired in direct contact with his right cheek. The bullet fragmented and perforated the base of Seri's skull and brain, causing instantaneous death.

### b. *Hernandez's Attempt to Avoid Detection*
Ludovina Nunez confirmed that on May 21, 1992 Hernandez had asked her to cut his hair as well as that of Ms. DeJesus. Petitioner had explained that he had just done something and did not want to be recognized. After Ms. Nunez finished cutting Hernandez's hair, petitioner went into an adjoining room and dyed it. Later, Hernandez told Ms. Nunez that if a man came to their building with a bag of money, she should let him know. When she asked why he was getting money, petitioner stated that he had just killed someone.

### c. *Hernandez's Post–Arrest Statement*
Petitioner was arrested on May 30, 1992 by New York City Detective William Ingwersen who advised him of his rights and secured a written waiver. Detective Ingwersen testified that Hernandez initially denied knowing anything about the Seri murder or even being in Highland Park on May 21, 1992. After Ingwersen told him that a number of witnesses had seen him at the murder scene, Hernandez provided a different version of events, first orally and then on videotape.

**\*3** Petitioner stated that on the afternoon of May 21, 1992, he was approached by Benji, Bebe, and Jose Vazques, who offered him $500 to drive a station wagon because they "needed to talk to someone." Bebe then brought the victim, whom Hernandez referred to as "Buda," to the corner of Bradford and Fulton Streets in Brooklyn. Hernandez drove Buda, Benji, and a girl named "Julia" to Highland Park. Bebe followed in a white Camaro. Once they had parked, Benji told petitioner to get out of the car. As he did so, Hernandez saw Benji put a nine-millimeter gun to the right side of Buda's head and shoot him once. Hernandez, Julia, and Benji then got into the Camaro, which Bebe drove out of the park. The group returned to Bradford and Fulton Streets where they met two men named Gustavo and Herman. Julia demanded $1,000, which Herman paid. He also paid Benji $500 for the gun used in the shooting, since he did not want it on the street. Herman told petitioner that he would be paid later by Moca, Carlos, and Moreno.

Hernandez's claim that Benji actually killed Santiago Seri appeared to be corroborated by an August 6, 1992 letter written by Ms. DeJesus to petitioner in jail. Although this letter was read to the jury, Ms. DeJesus expressly disavowed its contents at trial. She testified that she had written the letter at Hernandez's request and that he had told her what to say.

### d. *The Verdict and Sentencing*
The jury found Hernandez guilty of the second degree murder of Santiago Seri as well as criminal possession of a weapon in the second degree.

Before sentencing petitioner on October 19, 1994, Justice David Goldstein commented on Hernandez's occasional unconventional behavior. For example, Hernandez often acted dazed and inattentive. Even on October 19, he focused on the corner of the courtroom rather than on the bench. Further, his neck and left forearm had self-

inflicted, superficial lacerations. Justice Goldstein observed that Hernandez had been sent for various psychiatric evaluations during his prosecution, all of which found him to be competent. Indeed, the most recent evaluation, conducted expressly for sentence, found that petitioner was "not suffering from any mental disease or defect other than his desire not to be sentenced."Sentencing Trans. p. 4. The judge concluded from "[a]ll of the reports, the testimony I've heard, the review of the entire case," that Hernandez was not suffering from any mental disease or defect that rendered him legally incompetent. Rather, he found petitioner to be "a lying, manipulative malingerer who thinks this is just a joke, including your act, the homicide you committed."*Id.* at 18.He imposed concurrent indeterminate terms of twenty-five years to life for the Seri murder and five to fifteen years for weapon possession.

### 2. *The 1995 Conviction for Attempted Murder*
In the weeks immediately before and after his sentencing for the murder of Santiago Seri, Hernandez hatched a scheme to kill Justice Goldstein and the prosecutors involved in his 1994 case. Toward this end, he recruited fellow inmate Alex Sokolov, arranged to make installment payments for the murders, had $5,000 delivered as partial payment, and met with an undercover detective who posed as the "hit man."

### a. *The Tape Recorded Conversation between Hernandez and Sokolov*
**\*4** In mid-October 1994, while housed with Hernandez at the Kings County Psychiatric Ward, convicted robber Alex Sokolov advised police that petitioner had offered to pay $125,000 to have Queens District Attorney Richard A. Brown, Assistant District Attorney Jack Warsawsky, and Detective William Ingwersen killed. In an effort to confirm the account, the police arranged for Sokolov to wear a concealed wire for an October 21, 1994 prison meeting with Hernandez. The resulting tape recording makes chillingly plain that Hernandez was determined to have Messrs. Brown, Warsawsky, Ingwersen, and Justice Goldstein killed. Indeed, in an effort to deprive Warsawsky of his reputation as well as his life, Hernandez stated that he wanted a crack vial planted on the prosecutor's dead body. Sokolov insisted that some money would have to be received before any of the murders were carried out. The men agreed that payment would be made to Inessa Kurepina, Sokolov's mother.

### b. *The Delivery of the Down Payment to Sokolov's Mother and the Conversations with the Undercover Officer*
In late October and early November, 1994, the police consensually recorded a series of telephone calls from Hernandez to Inessa Kurepina, generally inquiring as to whether Ms. Kurepina had yet received the payment money. On November 4, 1994, she did find a package under her apartment doormat containing $5,000.

Thereafter, Hernandez was given a telephone number for "Nicholas," purportedly a Russian immigrant hit man but in fact Police Captain Edward Brady. A number of recorded conversations between Hernandez and "Nicholas" ensued. In the first, on November 17, 1994, Hernandez asked "Nicholas" if he had received the money. When "Nicholas" replied that he had, Hernandez told him that the first person he wanted killed was Jack Warsawsky. The next victim was to be Justice Goldstein. Hernandez provided "Nicholas" with personal information about the two targets to assist in locating them. When "Nicholas" asked about payment, Hernandez replied that another $45,000 would be delivered when the newspapers reported that Warsawsky was dead.

The next day, Hernandez told "Nicholas" that a friend had told him that "Nicholas" was under investigation by the FBI. Hernandez decided they should "lay back" for a while and asked to have $4,000 of the down payment returned. In fact, Hernandez was arrested later that day and charged with attempted murder. A court-authorized search of his jail cell yielded various papers with telephone numbers for "Nicholas" and Justice Goldstein's trial part, as well as general information about Jack Warsawsky.

### c. *Hernandez's Post–Arrest Statements*
Detective Daniel Rizzo testified that after being arrested, Hernandez screamed obscenities about District Attorney Richard Brown and the undercover officer who had posed as "Nicholas." At one point, he claimed that Benji was going to kill Brown and asked to speak to an Assistant District Attorney. At other times, he insisted that he was crazy. When the detective had Hernandez shackled, petitioner stated that he was not really crazy; rather, he feigned the condition and threatened suicide to avoid being placed in "the hole."

**\*5** The following month, Hernandez was transferred to the Mental Health Unit of the Auburn Correctional Facility. Lieutenant Frederick Kruger, an officer at that facility, testified that on December 22, 1994, he advised Hernandez of

a court order prohibiting him from making outside telephone calls to anyone except his attorney. Hernandez replied that he would not obey the order. He stated that he had already paid $50,000 on a contract to have the judge and district attorney who were involved in his previous case killed, and he intended to continue communicating with people in order to accomplish these "hits." Parts of the latter statement were overheard by two other corrections officers, William Kuszaj and Cliff Breeze.

#### d. The Defense Case

Petitioner testified in his own defense. He stated that he was born in Cuba where he was active in anti-communist activities. Imprisoned at age 15 for four years, Hernandez stated that he emigrated to the United States in 1979 and was held in immigration custody until 1989. He claimed to have knowledge of criminal activities by an Assistant District Attorney in Queens, a state judge in Brooklyn, and various law enforcement officers. He asserted that he had been framed for the Seri murder because he was the only person who could expose this corruption. Hernandez testified that Justice Goldstein, Richard Brown, Jack Warsawsky, and his own lawyer had all collaborated to secure his unjust conviction for that murder. Nevertheless, he insisted that he had not attempted to kill any of them. Indeed, on cross-examination, he specifically denied the prosecutor's suggestion that he had ever called Justice Goldstein's chambers. [2]

Hernandez could not, of course, deny his recorded conversation with Sokolov. Instead, he testified that these statements were part of a carefully orchestrated plan by the two men to secure their freedom. Sokolov would go to the authorities claiming that Hernandez was planning to kill some people and offer his cooperation in return for his liberty. Once Sokolov produced enough evidence to win his own release, he and his criminal associates would arrange for Hernandez to escape from jail. Hernandez denied ever sending any money to Sokolov's mother. He testified that the $5,000 had been put up by Ms. Kurepina to convince the authorities that her son was cooperating with them.

On cross-examination, Hernandez did admit creating a fake bomb while incarcerated at the Queens House of Detention. He explained that he was trying to get out of prison so he could call attention to the abuses he had sustained. He further acknowledged falsely telling the judge presiding over his attempted murder case that a bomb had been planted in the courthouse. He stated that this also represented an effort to

call attention to rights violations occurring in jail. Hernandez admitted smuggling razor blades into the courtroom. He explained that he wished to show the judge that prison security measures were ineffective.

#### e. The Verdict and Sentencing

*6 The jury found Hernandez guilty of three counts of conspiracy to murder Richard Brown, Jack Warsawsky, and Justice David Goldstein. It found him not guilty of conspiracy to murder Detective William Ingwersen.

At sentencing, petitioner maintained his innocence and accused prosecutors of fabricating both cases against him. He alleged that the trial transcripts had been altered. Additionally, he ranted, cursed, and made implicit and explicit threats against the prosecutors and the sentencing judge. The court sentenced petitioner to three concurrent indeterminate prison terms of twelve-and-one-half to twenty-five years. These terms were to run consecutively to the sentence imposed on the 1994 conviction. Additionally, the court sentenced Hernandez to six consecutive prison terms of thirty days for six separate instances of criminal contempt, N.Y. Judiciary Law § 750 (McKinney's 1992), based on petitioner's offensive conduct during the trial and sentencing proceedings.

### 3. Procedural History

#### a. Direct Appeal

##### (1) The 1994 Conviction

Hernandez challenged his 1994 conviction on the grounds that (1) a mistrial should have been declared after Rachel DeJesus testified about an uncharged "hit"; (2) the trial court erred in not redacting portions of his videotape statement dealing with uncharged crimes; and (3) the prosecutor had unfairly vouched for the credibility of a witness, denigrated the defense, and commented on petitioner's post-arrest silence. The Appellate Division rejected these arguments and affirmed Hernandez's first conviction on June 30, 1997. *See People v. Hernandez*, 240 A.D.2d 759, 660 N.Y.S.2d 1004 (2d Dep't 1997). Specifically, the court found that (1) any possible prejudice from DeJesus's testimony was alleviated by the trial court's curative instruction; (2) the failure to redact the videotape was harmless in view of the overwhelming evidence of guilt; and (3) Hernandez's remaining contentions were unpreserved for appellate review and, in any event, without merit. *Id.*

Petitioner's application for leave to appeal to the New York Court of Appeals was denied on August 21, 1997. *SeePeople v. Hernandez*, 90 N.Y.2d 905, 663 N.Y.S.2d 517, 686 N.E.2d 229 (1997) (Bellacosa, J.).

**(2) *The 1995 Conviction***
Hernandez challenged his 1995 conviction on a single ground: the insufficiency of the evidence. The Appellate Division rejected this argument, finding that the "various conversations in which [Hernandez] discussed the details of the murder plot were sufficient to satisfy the overt act requirement of his convictions for conspiracy."*People v. Hernandez*, 242 A.D.2d 339, 661 N.Y.S.2d 978 (2d Dep't 1997).

Petitioner's application for leave to appeal to the New York Court of Appeals was denied on January 5, 1998. *SeePeople v. Hernandez*, 91 N.Y.2d 892, 669 N.Y.S.2d 7 (1998) (Levine, J.).

**b. *State Collateral Challenges to the Convictions***

**(1) *Section 440 Challenge to the 1994 Conviction***
 *7  On May 21, 1998, Hernandez filed a pro se motion to vacate his 1994 conviction pursuant to N.Y.Crim. Proc. Law § 440.10 (McKinney 1994). He asserted that (1) Detective Joseph Ponzi had promised to have Hernandez's case dismissed if petitioner refused to cooperate in a federal investigation of a corrupt Queens County prosecutor; (2) the prosecutor had obtained his conviction by fraud; (3) altered evidence, specifically, the victim's autopsy report, was introduced at trial; (4) it was error to admit a statement by Miguel Nunez into evidence; (5) he was mentally incompetent to stand trial; (6) his post-arrest statements had been procured in violation of his Fifth and Sixth Amendment rights; (7) the prosecution had withheld material that it was obliged to disclose under *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961) and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (8) there was newly discovered evidence favorable to the defense; (9) Hernandez's trial counsel had been constitutionally ineffective; and (10) the prosecutor had impermissibly commented on Hernandez's post-arrest silence.

The motion was denied in its entirety on July 28, 1998, by Justice Cooperman, who had also presided over petitioner's

1995 murder conspiracy trial. *SeePeople v. Hernandez*, Ind. No. 2522/92 (Sup.Ct. Queens Co. July 28, 1998). The court ruled that many of Hernandez's claims were procedurally barred since they had not been raised on direct appeal. These included (1) his complaint about Detective Ponzi, (2) the challenge to the victim autopsy report, (3) the claim of mental incompetency, and (4) the constitutional challenge to petitioner's post-arrest statements. In any event, the court carefully detailed why these claims, as well as all others raised by Hernandez, were without merit.

On August 25, 1998, petitioner sought leave to appeal the denial of his § 440 motion to the Appellate Division, Second Department. This appeal was denied on March 30, 1999. *SeePeople v. Hernandez*, No. 99–07951 (2d Dep't Mar. 30, 1999).

**(2) *Coram Nobis Challenge to the 1994 Conviction***
Meanwhile, on June 9, 1998, Hernandez filed a pro se petition with the Appellate Division for a writ of error coram nobis based on ineffective assistance of appellate counsel. In essence, Hernandez argued that appellate counsel was deficient for failing to raise many of the claims that were found procedurally barred on § 440 review. The petition was denied on the merits on October 26, 1998. *SeePeople v. Hernandez*, 254 A.D.2d 498, 679 N.Y.S.2d 835 (2d Dep't 1998).

**(3) *Section 440 Challenge to the 1995 Conviction***
On October 19, 1998, Hernandez filed a pro se motion to vacate his 1995 conviction pursuant to N.Y.Crim. Proc. Law § 440.10. He argued that (1) the trial court had no jurisdiction over him, (2) the tape-recorded conversations between himself and Sokolov had been obtained in violation of state and federal law, (3) he was mentally incompetent to stand trial, (4) the trial record was incomplete and inaccurate, (5) prosecutorial misconduct in summation denied him a fair trial, and (6) his trial counsel was constitutionally ineffective.

 *8  The motion was denied by Justice Cooperman who, in a detailed ruling issued January 25, 1999, found that the claims could all have been raised on direct appeal and were, therefore, procedurally barred from collateral review. In any event, he explained why each claim was without merit. *SeePeople v. Hernandez*, Ind. No. 1518/95 (Sup.Ct. Queens Co. Jan. 25, 1999). Petitioner's application for leave to appeal to the Appellate Division was denied on March 17, 1999.

Hernandez v. Senkowski, Not Reported in F.Supp.2d (1999)

1999 WL 1495443

*SeePeople v. Hernandez,* No. 99–00993 (2d Dep't Mar 17, 1999) (Mangano, J.).

### c. *The Federal Petitions for Habeas Corpus Relief*

On August 17, 1998, Hernandez petitioned this court for a writ of habeas corpus vacating his 1994 state conviction for murder and weapon possession. On January 11, 1999, he petitioned for a writ of habeas corpus vacating his 1995 state conviction for three counts of conspiracy to murder.

### *Discussion*

### I. *Standard of Review*

This court's review of Hernandez's petitions is governed by the standards articulated in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 100 Stat. 1214, 1220 (1996), which significantly amended the federal habeas corpus statute, 28 U.S.C. § 2254. Subsection (d) of § 2254 now provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence in the State court proceeding.

Although the Second Circuit has yet to discuss how these standards should be applied, a number of other appellate courts have endeavored to provide guidance. *SeeLong v. Humphrey,* 184 F.3d 758, 759–61 (8 [th] Cir.1999); *Matteo v. Superintendent,* 171 F.3d 877, 891 (3d Cir.), *cert. denied,*528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999); *Davis v. Kramer,* 167 F.3d 494, 500 (9 [th] Cir.1999), *petition for cert. filed,*528 U.S. 1133, 120 S.Ct. 1001, 145 L.Ed.2d 926, 67 U.S.L.W. 3570 (U.S. Mar. 8, 1999) (No. 98–1427); *Nevers v. Killinger,* 169 F.3d 352, 361–62 (6 [th] Cir.), *cert. denied,*527 U.S. 1004, 119 S.Ct. 2340, 144 L.Ed.2d 237 (1999); *O'Brien v. DuBois,* 145 F.3d 16, 24

(1 [st] Cir.1998); *Green v. French,* 143 F.3d 865, 870 (4 [th] Cir.1998), *cert. denied,*119 S.Ct. 884 (1999); *Neeley v. Nagle,* 138 F.3d 917, 924 (11 [th] Cir.1998), *cert. denied,*525 U.S. 1075, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999); *Drinkard v. Johnson,* 97 F.3d 751, 767–68 (5 [th] Cir.1996); *Lindh v. Murphy,* 96 F.3d 856, 870 (7 [th] Cir.1996), *rev'd on other grounds,*521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *see alsoPatterson v. Headley* 58 F.Supp.2d 274, 279–280 (S.D.N.Y.1999) (discussing different approaches endorsed by various circuits). Particular effort has been made to explain what constitutes an "unreasonable application of" Supreme Court precedent by a state court. In *Matteo v. Superintendent,* 177 F.3d at 891, the Third Circuit stated that a habeas court should ask "whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot be justified."The Ninth Circuit, in *Davis v. Kramer,* 167 F.3d at 500, ruled that "a state court decision amounts to an unreasonable application of clearly established federal law where the state court fails to apply a legal principle, enunciated in one or more Supreme Court decisions, to a situation where such application is required by the force and logic of the court's decision."The First Circuit, in *O'Brien v. DuBois,* 145 F.3d at 24, held that "for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that is outside the universe of plausible credible outcomes."Meanwhile, the Fifth Circuit has ruled that a state court's application of law to facts is unreasonable only if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists."*Drinkard v. Johnson,* 97 F.3d at 769.

*9 Hernandez is not entitled to a writ of habeas corpus because he cannot show that the state court's rejection of his claims was an unreasonable application of Supreme Court precedent under any of these articulation of the § 2254(d) standard of review.

### II. *1994 Conviction*

### A. *Sufficiency of the Evidence*

Hernandez submits that the evidence adduced at his 1994 trial was insufficient to support a finding that he was guilty beyond a reasonable doubt of the murder of Santiago Seri. He submits that key prosecution witnesses such as Rachel DeJesus and Ludovina Nunez were not credible, that no other person present in Highland Park at the time of the Seri murder

Hernandez v. Senkowski, Not Reported in F.Supp.2d (1999)

1999 WL 1495443

could identify him, and that his fingerprints were not found in the beige station wagon.

Preliminarily, the court notes that Hernandez did not challenge the sufficiency of the evidence supporting his 1994 conviction in the state courts either on direct or collateral review. 28 U.S.C. § 2254(b)(1)(A) specifically states that "an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—(A) the applicant has exhausted the remedies available in the courts of the State." Dismissal, however, is not warranted where, as here, it appears clear that the state court would hold the unexhausted claim procedurally barred. *See Harris v. Reed,* 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *accord Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir.1997); *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991) (citing N.Y. Ct. Rules § 500.10(a) (McKinney 1998) (permitting only one application for leave to appeal), and N.Y. Crim Proc. Law § 440.10(2) (barring collateral review of claims that could have been raised on direct appeal)). Under such circumstances, a federal court will deem the claim exhausted, but treat review of the merits as procedurally barred absent (1) a demonstration that the failure to consider the federal claim will result in a fundamental miscarriage of justice such as the conviction of an actually innocent person, or (2) a showing of both good cause for the procedural default and ensuing prejudice. *See Harris v. Reed,* 489 U.S. at 262; *Grey v. Hoke,* 933 F.2d at 121.

Hernandez cannot satisfy this standard. He cannot show any fundamental miscarriage of justice, since he fails to establish actual innocence. *See Harris v. Reed,* 489 U.S. at 262. Further, nothing in the record demonstrates good cause to excuse his failure to raise a sufficiency claim either on direct appeal or in his § 440 motion. Neither can he demonstrate prejudice since, for the reasons discussed *infra,* his claim is patently without merit. Indeed, when an unexhausted claim is without merit, Congress has now empowered district courts to deny habeas petitions "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

*10  In considering the merits of Hernandez's sufficiency claim, this court begins with the Supreme Court's admonition that "[f]ederal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983); *accord Herrera v. Collins,* 506 U.S. 390, 401, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Thus,

this court may not "make its own subjective determination of guilt or innocence." *Jackson v. Virginia,* 443 U.S. 307, 320 n. 13, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Neither may it "weigh the evidence." *Herrera v. Collins,* 506 U.S. at 400–01 (quoting *Hyde v. Shine,* 199 U.S. 62, 84, 25 S.Ct. 760, 50 L.Ed. 90 (1905). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. at 318–19 (emphasis in original). In this case, the evidence plainly supports the jury's finding of guilty.

Rachel DeJesus testified that she was with Hernandez in Highland Park when he killed Santiago Seri. Her account of how she and Hernandez fled the scene was corroborated by a number of eyewitnesses. Ms. DeJesus also testified that a day before the Seri homicide, Hernandez told her that he had been offered money to commit a contract murder. Similarly, Ludovina Nunez testified that, soon after Seri's murder, Hernandez told her he was expecting money from people for whom he had committed a murder. She recounted how Hernandez and DeJesus radically altered their appearances after the murder, cutting their hair, and in Hernandez's case, changing its color, actions that demonstrated consciousness of guilt. Although Hernandez submits that these witnesses were unreliable, this court must assume that the jury found them credible. *See Bossett v. Walker,* 41 F.3d 825, 830 (2d Cir.1994) (determining witness credibility is the exclusive responsibility of the jury); *accord United States v. Allah,* 130 F.3d 33, 45 (1997) (even on direct appeal, a reviewing court must view the evidence in the light most favorable to the government and defer to the jury in assessing witness credibility); *United States v. Roman,* 870 F.2d 65, 71 (2d Cir.1989) ("the proper place for a challenge to a witness's credibility is 'in cross-examination and in subsequent argument to the jury, not in an appellate brief' " (quoting *United States v. Friedman,* 85 F.2d 535, 558 (2d Cir.1988)). It finds that the evidence was sufficient to support the jury's guilty verdict.

This conclusion is not altered by the fact that none of Hernandez's fingerprints were found in the car containing Seri's dead body or that none of the park witnesses could identify him. In his own statement to the authorities, Hernandez admitted being in Highland Park and, indeed, in the beige station wagon at about the time Seri was shot. The key issue at trial was not his presence at the murder scene; it was his role as the murderer. On this point, Ms.

DeJesus's testimony as to what occurred in the park, which was corroborated in important respects by eyewitnesses, as well as by Hernandez's admissions to both Ms. DeJesus and Ms. Nunez regarding his involvement in a contract murder, provided sufficient evidence to convict.

**\*11** The sufficiency claim is rejected as both procedurally barred and without merit.

### B. Competency

Despite the fact that he has conducted extensive, cogent pro se litigation in the state and federal courts, Hernandez claims that he was incompetent at the time of his 1994 trial and sentencing to understand the court proceedings. He asserts that the trial court's failure to conduct a competency hearing denied him due process of law.

When this argument was first raised in petitioner's § 440 challenge to his 1994 conviction, the state court found that petitioner's failure to raise it on direct appeal constituted a default. *See People v. Hernandez,* Ind. No. 2522/92 (citing N .Y.Crim. Pro. Law § 440.10(2)(c) (McKinney's 1994)). When a state court denies a federal claim on an adequate and independent state law ground, including procedural default, a federal court may not reach the merits unless petitioner can demonstrate actual innocence or satisfy the cause and prejudice standard. *See Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *accord Glenn v. Barlett,* 98 F.3d 721, 724–25 (2d Cir.1996).

The strong evidence of guilt precludes any claim of actual innocence. Instead, Hernandez claims that the ineffectiveness of his appellate counsel constitutes good cause to excuse his default. *See Murray v. Carrier,* 477 U.S. 478, 488 (1986) (recognizing ineffective assistance of counsel as cause to excuse a procedural default). A prisoner proffering such a cause carries a heavy burden. He must demonstrate both (1) that counsel's performance was so unreasonable under prevailing professional norms that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); and (2) that counsel's ineffectiveness prejudiced the defendant such that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *accord United States v. Trzaska,* 111 F.3d 1019, 1029 (2d Cir.1997). Petitioner cannot satisfy this standard. Since his competency challenge is plainly without merit, it was reasonable for appellate counsel not to raise

the issue on appeal. *See Jones v. Barnes,* 463 U.S. 745, 75–54 (1983) (holding that Sixth Amendment does not require appellate counsel to raise every colorable claim or error, and noting that it is the hallmark of an effective advocate to isolate out of a voluminous trial record those three or four issues most likely to persuade a reviewing court). Further, since the claim lacks merit, Hernandez cannot show that he was prejudiced by the procedural default.

While the Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent [person] violates due process," ' *Cooper v. Oklahoma,* 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (citing *Medina v. California,* 505 U.S. 437, 453, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)); *see Drope v. Missouri,* 420 U.S. 162, 171–72, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v.. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), it has not interpreted due process to require a competency hearing in every case in which a question is raised as to a defendant's mental capacity. The Second Circuit has ruled that a hearing is constitutionally required "only if the court has 'reasonable cause' to believe that the defendant has a mental defect rendering him incompetent." *United States v. Nichols,* 56 F.3d 403, 414 (2d Cir.1995); *see also Nicks v. United States,* 955 F.2d 161, 167–69 (2d Cir.1992).

**\*12** Legal competency depends on two inquiries: does the defendant have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and does the defendant have "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *accord Cooper v. Oklahoma,* 517 U.S. at 354. A variety of factors may be considered in assessing whether there is reasonable cause to question legal competency, including a defendant's irrational behavior or inappropriate demeanor in court, the opinion of defense counsel, and any medical opinions. *See Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Ultimately, however, the "determination of whether there is 'reasonable cause' to believe a defendant may be incompetent rests in the discretion of the [trial] court," whose view will be accorded considerable weight on either direct or collateral review. *United States v. Nichols,* 56 F.3d at 414 (quoting *United States v. Vamos,* 797 F.2d 1146, 1150 (2d Cir.1986)).

In this case, the record indicates that the trial court fully appreciated its obligation to ensure petitioner's competency before subjecting him to criminal proceedings. When

Hernandez engaged in odd courtroom behavior, the court ordered psychiatric examinations, at least one before trial, and another before sentencing. It is undisputed that the doctors conducting these examinations uniformly concluded that Hernandez was competent. Based on these reports, its own observations, and those of other court personnel, the trial court concluded that Hernandez's aberrant conduct was feigned. It specifically noted the marked difference between Hernandez's behavior in court and his behavior out of court:

> [In court, he] seemed to be out of it, he seemed to be in a daze, he seemed to be collapsing on his feet, but it just shows you miracles happen. On the ride down to the basement elevator, as soon as he hit the basement and got into the cell, he washed his face off and seemed to be fine.

Sentencing Trans. pp. 4–5.

Hernandez submits various subsequent medical records, notably a 1996 finding that he has a psychotic disorder, to support his competency challenge before this court. The court is not persuaded that these records require further inquiry. It is hardly surprising to learn that psychiatrists have found that petitioner—a man who killed for hire, and who thereafter plotted the murder of the prosecutors and judge in his case—suffers from various mental as well as moral deficiencies. Legal competency, however, does not depend on perfect mental health. A defendant is legally competent to stand trial if he has a rational understanding of the proceedings against him and if he can reasonably consult with his lawyer in the preparation of his defense. In this case, the contemporaneous medical evaluations of petitioner, the trial court's own assessment of his behavior, and a review of Hernandez's pro se filings all indicate that he was legally competent. Due process did not require a further hearing.

**\*13** This court rejects petitioner's competency challenge to his 1994 conviction as both procedurally barred and, in any event, without merit.

### C. Failure to Suppress Post–Arrest Statements

Hernandez submits that his oral and recorded post-arrest statements to the police should have been suppressed because they were obtained in violation of his Fifth and Sixth Amendment rights. Specifically, Hernandez claims that the statements were involuntary, having been induced by the physical and psychological coercion of Detective Ingwersen, and that his request to speak to counsel was never honored.

Like petitioner's competency challenge, this claim was first presented to the state court on § 440 review, where it was rejected on the procedural ground that it had not been presented on direct appeal. Accordingly, it is procedurally barred from federal review absent a showing of cause and prejudice or actual innocence. Once again, the court finds nothing in the record to support a claim of innocence. Similarly, to the extent Hernandez cites the ineffectiveness of his appellate counsel as the cause excusing his procedural default, the court finds that he was not prejudiced by the alleged omission since his claim lacks merit.

The admissibility of Hernandez's post-arrest statements was one of several issues considered by the state court in a pre-trial hearing. Detective Ingwersen testified that he advised petitioner of his constitutional rights after transporting him to the 104th Precinct on May 30, 1992. Hernandez specifically initialed and waived each right enumerated on a printed form as it was read to him. He did not ask to speak to an attorney. Thereafter, Hernandez was questioned about the events in Highland Park on May 21, 1992. Initially, he denied being in the park, but subsequently he admitted driving a beige station wagon to that location in return for $500. Hernandez insisted, however, that it was Benji and not he who had shot Santiago Seri. Ingwersen testified that he had Hernandez repeat this statement so that he could write it down. The officer then had petitioner review and sign the document. Thereafter, Hernandez agreed to repeat the statement on videotape. Ingwersen testified that throughout this time, Hernandez appeared cogent and not under the influence of narcotics or alcohol. He insisted that petitioner was never threatened or assaulted.

Petitioner did not testify at the hearing. He did, however, engage in extended colloquy with the court, asserting that he was framed for the Seri murder by the "Blue Tops," a drug gang whom he claimed was bribing the police. He identified Ernesto Diaz as the actual killer and stated that Diaz had admitted the crime in a tape recorded conversation with his prior attorney.[3]

In a written decision dated March 29, 1994, the court denied Hernandez's pretrial motions. With specific reference to the post-arrest statements, the court credited Detective Ingwersen's testimony. It found that Hernandez had been advised of his constitutional rights and knowingly,

intelligently, and voluntarily waived them prior to making any statements to the police. Further, relying on petitioner's appearance on the videotape, the court concluded that petitioner's statements were voluntary, and that he was in full control of his faculties.

**\*14** Plainly, the state court was in the best position to weigh the evidence developed at the hearing and to evaluate the credibility of the witnesses. This court cannot say that its conclusions were "based on an unreasonable determination of the facts in light of the evidence."28 U.S.C. § 2254(d)(2). Accordingly, to the extent Hernandez seeks habeas relief based on the claim that his post-arrest statements should not have been received in evidence, his petition must be rejected as both procedurally barred and without merit.

### D. *Infringement of the Right to Call Witnesses*
Hernandez contends that his Sixth Amendment right to present witnesses was infringed by the trial court's refusal to allow him to call Ernesto Diaz to testify on the defense case or to present evidence of Diaz's "confession."

Hernandez submits that Ernesto Diaz is Bebe and that, in a tape recorded conversation with petitioner's former attorney, Diaz admitted that he shot Santiago Seri. When Hernandez's trial counsel indicated that he wished Diaz to testify, the court appointed an attorney for the prospective witness and held a hearing outside the presence of the jury. During that hearing, Diaz made plain that he would invoke his Fifth Amendment right to remain silent in response to all questions concerning the substance of any conversations he may have had with Hernandez's former or present counsel as well as to all questions concerning his involvement in the Seri murder. *See* Trial Trans. pp. 739–41. The trial court ruled that Diaz's willingness to answer other questions about collateral matters did not waive the privilege. It refused to allow him to take the stand simply to assert the Fifth Amendment before the jury.

Hernandez's claim that his right to call witnesses was infringed is procedurally barred from federal review since it was not raised on direct appeal in the state courts and, therefore, held procedurally defaulted when advanced as a ground for § 440 relief. No proof of actual innocence exists to lift this procedural bar. Similarly, despite Hernandez's complaints about his appellate counsel, he cannot show good cause or ensuing prejudice to excuse the default since his claim is without merit.

The trial court was correct in ruling that Diaz did not waive his Fifth Amendment right to remain silent regarding the Seri murder simply by providing a few brief responses to questions about his acquaintanceship with Hernandez in prison, his meetings with defense counsel, and his use of the alias "John Gomez." As the Supreme Court noted in *Smith v. United States,* 337 U.S. 137, 150, 69 S.Ct. 1000, 93 L.Ed. 1264 (1949), testimonial waivers of the Fifth Amendment are not to be lightly inferred. Two factors are critical to any testimonial waiver: (1) a witness's prior testimony must have created a significant likelihood that the finder of fact will be left with a distorted view of the truth if further testimony is not compelled; and (2) the witness must have known that the prior testimony would be interpreted as a waiver of the Fifth Amendment. *See Klein v. Harris,* 667 F.2d 274, 287 (2d Cir.1981). Neither is present in this case. Since Diaz testified at a hearing outside the presence of the jury, the first element is plainly lacking. In any event, his few brief responses did not create any distorted view of his role or that of petitioner in the charged crime. More important, nothing in the record indicates that Diaz would have understood his responses to constitute a waiver. Generally, a witness's statements must be both testimonial and self-incriminating to support such an inference. *See id.* at 288.In sum, there is no merit to Hernandez's claim that Diaz should have been compelled to testify.

**\*15** Similarly meritless is any claim that Hernandez was entitled to have Diaz invoke the Fifth Amendment before the jury. *See United States v. Deutsch,* 987 F.2d 878, 883 (2d Cir.1993) (holding that a trial court has the discretion to prevent a party from calling a witness solely to have the privilege against self-incrimination invoked in front of the jury). As the Supreme Court has observed, "The claim of privilege and its allowance is properly no part of the evidence submitted to the jury, and no inferences whatever can be legitimately drawn by them from the legal assertion by the witness of his constitutional right." *Johnson v. United States,* 318 U.S. 189, 196–97, 63 S.Ct. 549, 87 L.Ed. 704 (1943) (quoting *Phelin v. Kenderdine,* 20 Pa. 354, 363 (1853)).

Hernandez submits that, nevertheless, his trial attorney should have offered Diaz's recorded confession as a statement against the penal interest of an unavailable witness. He claims that on the tape Diaz states that after Hernandez and Ms. DeJesus got out of the car, "that's when I pulled the nine millimeter, I put it to the guy right side of the temple and I blasted him, okay."The court does not have a copy of the tape. Assuming *arguendo* that Hernandez's proffer is accurate, he

nevertheless fails to demonstrate how trial counsel would have authenticated the tape. Diaz, after all, refused to acknowledge that he had a telephone conversation with petitioner's former counsel, and Hernandez has submitted no affidavit from that attorney or any other witness who could have identified the voices. In any event, trial counsel had a number of strategic considerations to weigh in deciding whether to offer the Diaz tape in evidence. The person alleged to be Diaz or Bebe, purportedly says on the tape that he shot Santiago Seri. While this may have helped to shift the blame from Hernandez, it was actually inconsistent with petitioner's own post-arrest statement that Benji had fired the fatal shot. Moreover, a few days before the court hearing, Diaz changed his account, telling trial counsel that it was Benji and not himself or Hernandez who had shot Seri. This new, more corroborative version of events was itself fraught with problems: (1) assuming it could be used to Hernandez's benefit, how could it be introduced short of defense counsel testifying; (2) how could Diaz's inconsistent accounts be reconciled; (3) would the jury assume that Hernandez had induced Diaz to make the statements, as he had purportedly had induced Ms. DeJesus to write the Benji letter; and (4) how could any of Diaz's and Hernandez's accounts be reconciled with the testimony of park witnesses, all of whom reported seeing only one woman and one armed man exit the beige station wagon in which Santiago Seri's dead body was found. In sum, defense counsel, who had the opportunity to assess the demeanor and credibility of the various witnesses, was in the best position to assess whether the introduction of the Diaz tape or subsequent statement would assist or harm petitioner's defense. This court cannot say that the strategic decision not to offer the tape was so outside the broad range of objectively reasonable representation as to violate the Sixth Amendment, much less that appellate counsel was ineffective for failing to challenge trial counsel's strategy on appeal. See *Strickland v. Washington,* 466 U.S. at 689 (reviewing courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").

**\*16** For all these reasons, the court finds that there is no merit to Hernandez's claim that his appellate lawyer was constitutionally ineffective or that he was denied his right to present a defense by his inability to call Ernesto Diaz as a witness or to offer into evidence a tape recorded conversation or statement purportedly made by him. This Sixth Amendment claim is rejected as procedurally barred and without merit.

**E. Reference to Uncharged Crime**

Hernandez submits that he was denied due process when the trial court refused to declare a mistrial after Rachel DeJesus testified to an uncharged murder for which petitioner was solicited some months prior to the Seri homicide. The claim is both procedurally barred and without merit.

On direct examination by the prosecution, Ms. DeJesus testified to seeing Hernandez in conversation with three Dominican men on the day of the Seri shooting. She stated that she owed these men $300 for crack cocaine and that petitioner had told her that the men would forgive the debt if Hernandez did a "hit" for them. On cross-examination, she acknowledged that petitioner's statement about a hit and her crack debt occurred some months before the Seri murder and might well have related to a different victim. This prompted defense counsel to move to strike the testimony and to request a mistrial. Initially, the trial judge denied the motions, finding that defense counsel had opened the door to Ms. DeJesus's responses. The next day, however, the judge reconsidered the applications and struck the testimony, emphatically telling the jury that Hernandez was not charged with any murder other than that of Santiago Seri, and that they should disregard the statements of Ms. DeJesus about any other possible hit. *See* Trial Trans. p. 722. He again denied the motion for a mistrial.

In challenging the denial of a mistrial on direct appeal, Hernandez relied solely on New York criminal procedure law and New York cases. Nothing in his papers or the opposing submission of the prosecution made reference to the United States Constitution or to any federal case law. To satisfy the exhaustion requirements of § 2254, however, a petitioner must alert the state courts to the federal constitutional nature of his claim. *See generally Daye v. Attorney General of New York,* 696 F.2d 186 (1982); *accord Jones v. Vacco,* 126 F.3d 408, 413–14 (2d Cir.1997). As with Hernandez's sufficiency claim, it would be pointless for this court to dismiss petitioner's unexhausted mistrial claim since it appears that the state courts would not now entertain it. *See Grey v. Hoke,* 933 F.2d at 120 (citing N.Y. Ct. Rules § 500.10(a) (McKinney 1998) (permitting only one application for leave to appeal), and N.Y.Crim. Proc. Law § 440.10(2) (barring collateral review of claims that could have been raised on direct appeal)). Instead, this court treats the claim as procedurally defaulted and applies cause and prejudice analysis. Hernandez fails to establish cause and prejudice since his due process claim is plainly without merit.

**\*17** A challenge to an evidentiary ruling based on state law will generally not implicate federal due process unless

the error was sufficiently serious to deny petitioner his fundamental right to a fair trial. See *Estelle v. McGuire*, 502 U.S. 62, 71–72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *accord Blisset v. LeFevre*, 924 F.2d 434, 439 (2d Cir.1994). Rulings with respect to uncharged crimes or similar act evidence rarely rise to this level since federal and state trial courts enjoy considerable discretion in deciding when such evidence is properly placed before a jury. See generally *United States v. Bok*, 156 F.3d 157, 165 (2d Cir.1998) (trial judge's rulings on uncharged crime evidence will not be disturbed on appeal unless they were "arbitrary or irrational").

In this case, the trial court did not even permit the jury to consider DeJesus's testimony regarding a possible uncharged prior "hit." Her statements on this subject were struck, and the jury specifically instructed not to consider them. Courts generally "presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it." *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). This principle applies to instructions that a jury disregard inadmissible references to uncharged crimes. See, e.g., *United States v. Castano*, 999 F.2d 615, 618 (2d Cir.1993) (jury presumed to follow instruction that it not consider stricken tape recording referring to uncharged firearms); see also *People v. Santiago*, 52 N.Y.2d 865, 866, 437 N.Y.S.2d 75, 76, 418 N.E.2d 668 (1981) (instruction that jury disregard uncharged crime evidence adequate to cure error). Such instructions are particularly appropriate where, as here, the inadmissible statements form only a small and easily isolated portion of a witness's testimony. In such cases a jury is not required "to perform olympian mental gymnastics" to follow the instruction. See *United States v. Paone*, 782 F.2d 386, 395 (2d Cir.1986); see also *Greer v. Miller*, 483 U.S. at 766 n. 8 (due process implicated only if there is an "overwhelming probability" that the jury will not be able to follow court's instructions (quoting *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)).

Because the court's decision to strike the uncharged crime evidence and its subsequent instruction to the jury were adequate to protect Hernandez's right to a fair trial, his due process complaint that he was entitled to a mistrial is rejected as both procedurally barred and without merit.

### F. Prosecutorial Misconduct

Hernandez complains that the prosecutor improperly (1) assisted a witness in making an in-court identification, and (2) delivered a prejudicial summation. A conviction will be vacated for prosecutorial misconduct only when the actions at issue so infect the trial with unfairness that the defendant suffers substantial prejudice. See *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir.1999). The actions here at issue did not cause substantial prejudice violative of due process.

### (1) The Nunez Identification of Hernandez

**\*18** Hernandez complains that the prosecutor denied his right to due process by employing an impermissibly suggestive procedure during an in-court identification. This claim is unexhausted because petitioner failed to present it to the state courts either on direct or collateral review. As already noted, however, the court need not dismiss an unexhausted claim where, as here, it is clear that the state courts would hold the claim procedurally barred. See *Harris v. Reed*, 489 U.S. at 263 n. 9; *Grey v. Hoke*, 933 F.2d at 120. The court instead will deem the claim exhausted, and treat review of the claim's merits as procedurally barred absent either a demonstration of actual innocence, or a showing of both good cause for the default and ensuing prejudice. See *Harris v. Reed*, 489 U.S. at 262; *Grey v. Hoke*, 933 F.2d at 121. Hernandez cannot satisfy this standard: strong evidence of guilt precludes a finding of actual innocence; he has offered no excuse for his failure to raise the claim in the proper forum; and he cannot demonstrate prejudice because, as explained immediately below, the claim is meritless.

Ludovina Nunez, who testified to Hernandez's admissions after the Seri murder and to his efforts to disguise his appearance, was asked to identify him for the jury. She looked around the courtroom and reported that she did not see Hernandez. This prompted the prosecutor to point to Hernandez and, over defense objection ask, "The gentleman sitting at this table here?"Trial Trans. p. 424. Ms. Nunez replied, "Oh yes. Look at him. Yes, there, that's the one, the same one.... Yes, now he has different hair.... Because he has it black."*Id.*

Unquestionably, this procedure was impermissibly suggestive. See *United States v. Warf*, 529 F.2d 1170, 1174 (5 [th] Cir.1976) (prosecutor improperly pointed to defendant when asking witness to make an identification); see also *United States v. Archibald*, 734 F.2d 938, 941–42 (2d Cir.1984) (in-court identification of defendant who is seated alone at counsel table qualifies as a suggestive "show-up" that should be avoided when defense makes a specific request). The question remains: did the identification violate petitioner's right to due process so as to warrant habeas relief. Such an inquiry cannot focus only on the

prosecutor's misconduct, because "a suggestive procedure 'does not in itself intrude upon a constitutionally protected interest.' " *Dunnigan v. Keane,* 137 F.3d 117, 128 (2d Cir.1998) (quoting *Manson v. Brathwaite,* 432 U.S. 98, 113 n. 13, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). Rather, a court must consider whether the record as a whole reflects a likely misidentification of petitioner, since "it is the admission of testimony carrying such a 'likelihood of misidentification which violates a defendant's right to due process.' " *Id.* (quoting *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).

In conducting this inquiry, it is useful to begin with basic principles concerning identification evidence. As a general rule, identification testimony is for the jury to weigh unless there is "a very substantial likelihood of irreparable misidentification."*Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). That likelihood is most apparent when suggestive procedures are employed outside the presence of the jury. In such cases, the fact finder does not have the benefit of seeing the contemporaneous effect of the suggestive procedure on the witness. Even in those circumstances, however, the witness will be allowed to make an in-court identification if an independent reliable basis for the identification is established. *SeeNeil v. Biggers,* 409 U.S. at 199 (factors relevant to assessment of reliability include (1) witness's opportunity to view the suspect at the time of the crime, (2) witness's degree of attention during crime, (3) accuracy of witness's prior descriptions of criminal, (4) level of certainty demonstrated by witness, and (5) length of time between the crime and the identification). A jury is deemed competent to weigh the reliability of such an in-court identification against the potentially suggestive out-of-court procedures.

**\*19** This deference to the jury would seem even more appropriate in the case of suggestive in-court procedures, for there "the jury is present and able to see first-hand the circumstances which may influence a witness."*United States v. Rush,* 749 F.2d 1227, 1231 (7 th Cir.1984). This was plainly true in Hernandez's case. The jury saw Ms. Nunez look around the courtroom and state that she did not see Hernandez. Similarly, it saw the prosecutor point directly at petitioner and ask Ms. Nunez if he was Hernandez. Most importantly, the jury saw Ms. Nunez as she confirmed the identity. Based on these circumstances and the witness's demeanor throughout, the jury could decide whether her identification of Hernandez was a mere timid adoption of

the prosecutor's blunt suggestion or the product of her own independent reliable recollection.

Certainly, the *Neil v. Biggers* factors would have supported a jury conclusion that Ms. Nunez could make an independent identification. The evidence showed that Hernandez had been Ms. Nunez's neighbor for approximately five months in a building that had only three apartments. During that time she saw him almost daily. She knew him by his nickname "Cuba;" she knew his girlfriend, Ms. DeJesus, by her nickname "China." Ms. Nunez had several opportunities to observe Hernandez at close range, most particularly when she cut his hair and discussed his anticipated receipt of money. She testified in some detail as to these conversations and to petitioner's decision to color his hair. Everything in the record suggests that her attention during these encounters was acute. Further, the jury saw that Ms. Nunez was initially shown a photograph of Hernandez that was taken after his arrest when his hair was light. She promptly identified it. Asked to identify that same man in the courtroom, she said she did not see him. When the prosecutor pointed to petitioner, even the cold record suggests that Ms. Nunez was surprised to see that his hair was dark. The jury could fairly consider whether this adequately explained her earlier failure to recognize him.

It could also consider other evidence in the case that corroborated Ms. Nunez's identification of petitioner. Specifically, both an arrest photo and a videotape made after Hernandez's arrest showed that his hair was short and fair soon after the death of Santiago Seri. Moreover, Ms. DeJesus confirmed that she and Hernandez were the neighbors Ms. Nunez knew as China and Cuba, and that Ms. Nunez had cut their hair after the murder to alter their appearances. In sum, although the prosecutor's conduct was improper, the totality of circumstances do not suggest a "very substantial likelihood" that Ms. Nunez made an "irreparable misidentification."

Even if the admission of Ms. Nunez's testimony were found to violate due process, the error would nonetheless be harmless in light of the strong, independent evidence of petitioner's guilt, discussed above. *SeeBrecht v. Abrahmson,* 507 U.S. 619, 623, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (ruling that habeas relief is inappropriate unless a constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict" in light of the overall strength of the prosecution's case); *accordDunnigan v.. Keane,* 137 F.3d at 130. Indeed, Ms. Nunez's testimony did not even place Hernandez at the Seri murder scene. This petitioner did

1999 WL 1495443

himself on the videotape when he acknowledged that he drove Santiago Seri to Highland Park on May 21, 1992. Although he denied being the shooter, attributing that role to Benji, it was Ms. DeJesus and not Ms. Nunez who testified otherwise. Ms. DeJesus stated that only she and Hernandez were in the beige station wagon with Seri. After Hernandez shot Seri, the couple fled to another vehicle. This was corroborated by the observations of the various park witnesses, each of whom testified that one woman and one man, the latter armed with a gun, exited the car in which Seri's body was ultimately found.

*20 Finally, as noted at the beginning of this section, Hernandez would have to demonstrate that he was prejudiced by the identification in order to lift the procedural bar created by his failure to raise this claim in the state courts. *See Murray v. Carrier*, 477 U.S. 478, 494 (1986) (prejudice requires a habeas petitioner to show " 'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions" ') (quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). Hernandez would not be able to establish prejudice for the same reasons that he would not be able to surmount the harmless error standard of *Brecht v. Abramson*.

Because the jury could weigh for itself the reliability of Ms. Nunez's in-court identification, and because the totality of the other evidence overwhelmingly established Hernandez's guilt, this court finds that the suggestive actions of the prosecutor did not deny petitioner due process so as to warrant habeas corpus relief. Petitioner's claim is rejected as both procedurally barred and without merit.

*(2) Misconduct in Summation*
Hernandez complains that the prosecution, in summation, impermissibly vouched for the credibility of its witnesses and commented on petitioner's post-arrest silence. When these claims were first presented in petitioner's § 440 motion, the state court ruled that they were procedurally defaulted because they had not been raised on direct appeal. As already noted, this court cannot consider the merits of a federal claim defaulted in the state courts unless Hernandez can demonstrate actual innocence or show both good cause excusing his default and ensuing prejudice. He cannot satisfy this standard since the misconduct claims are without merit.

When habeas relief is sought based on comments made by a prosecutor in summation, the misconduct must be

particularly severe since "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *United States v.. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). A petitioner must show "more than mere trial error;" he must demonstrate that the challenged remarks, when viewed in context, were "so egregious" as to have "a substantial and injurious effect in determining the jury's verdict." *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir.1998); *accord United States v. Perez*, 190 F.3d at 78. None of the statements challenged in this case rise to this level.

The prosecutor did not impermissibly vouch for the credibility of Ludovina Nunez and Rachel DeJesus. In response to a defense suggestion that Ms. Nunez lied when she testified that Hernandez told her that he was expecting $100,000 for killing someone, the prosecutor responded:

> Look at Miss Nunez. Does she have a motive to tell you anything other than the truth? Is it incredible that somebody would tell somebody I just did a hit, somebody is going to come and pay me $100,000....It is pretty unbelievable. That doesn't mean it didn't happen.

*21 Trial Trans. p. 827. Reminding a jury that people often do and say curious things and that credibility should be evaluated with reference to motive does not constitute impermissible vouching.

Similarly, in response to a defense argument that Ms. Nunez was not credible because she had initially not identified Hernandez in court, the prosecutor asked the jury to compare his present appearance with how he looked at the time of his arrest:

> The fact that she couldn't initially pick the defendant out in court, is that of some significance? She identified the photograph. But you saw the defendant stand. Compare his present day appearance with the photograph and the video that was taken May 30, 1992. You will readily see that he has put on some good 20 or 30 pounds.

*Id.* The defense objected, noting that there was no evidence as to weight before the jury, but the trial court overruled,

finding that the jury could observe the defendant for itself. It is not impermissible vouching for a prosecutor to urge a jury to assess identification evidence in light of its own direct observation of a defendant's appearance.

As to Ms. DeJesus, defense counsel predictably urged the jury to reject her testimony because she had entered into a plea agreement with the government. The prosecutor responded by urging the jury to compare Ms. DeJesus's trial testimony with the statement she gave the authorities before entering into a plea agreement: "Did she fabricate her story only after the deal was made with her or was that the statement that she said from day one? You have that in evidence." Trial Trans. p. 826. An argument that points the jury toward evidence favorable to the prosecution does not constitute impermissible vouching.

Hernandez also challenges the following argument regarding Ms. DeJesus:

> Can't you make a deal and yet, in fact, be telling the truth? Did she receive some benefit? Sure she did. Does this automatically mean because she received a benefit that she wasn't telling the truth. I submit to you not. Because we know the evidence supports her testimony. We know part of the deal is that if her testimony is untruthful the deal is taken away.

*Id.* While it might have been preferable for the prosecution to avoid using the first person "we know," this error was not so egregious as to warrant habeas relief. The statement, considered in context, did not draw any impermissible link between the prosecutor's integrity and the witness's credibility. *Cf.Floyd v. Meachum*, 907 F.2d 347, 350, 354 (2d Cir.1990) (granting habeas in case where prosecutor engaged in numerous misdeeds, including vouching for witness by arguing, "if you believe I've intentionally put on any perjured testimony in this case ... acquit this man). Rather, the arguments advanced, however inartfully, were (1) that the witness's credibility was supported by the corroborating evidence, and (2) that her plea agreement was written to give her an incentive to tell the truth not to lie. Mindful that attorneys must deliver summations in the emotionally charged atmosphere of an ongoing trial and that they rarely have the ability to craft each phrase in advance, reviewing courts will not lightly ascribe more damaging interpretations to awkward phrases than the context warrants. *SeeDonnalley v. DeChristoforo*, 416 U.S. 637, 646–47, 94 S.Ct. 1868,

40 L.Ed.2d 431 (1974). In this case, the lack of any contemporaneous objection is a strong signal that the "we know" statements, as delivered at trial, were not perceived as so unfair or injurious to petitioner so as to deny him due process. *SeeUnited States v. Walker*, 191 F.3d 326, 337 (2d Cir.1999) (rejecting misconduct claim where no objection was raised at trial).

**\*22** Similarly, no trial objection was raised to that part of the prosecution's summation that Hernandez now contends unfairly commented on his right to remain silent:

> At the time [Hernandez] first speaks to the police [Ingwersen] tells him I'd like to talk to you about a homicide that occurred in Highland Park. Only he knows nothing. It is only when he is informed that they have witnesses to place you in the park does he change his tune. And then he gives the statement placing himself there. But he didn't know what was happening. I'm not the shooter. Why does he do that? If his statement is true that he was so scared he didn't know where he was, he just got his hair dyed, he didn't know what happened.
>
> What would the normal reaction be if you are not involved, if you are not guilty of any crime, if you're a total innocent? My understanding is as a defendant that you would be totally surprised and say this is insane and I don't know what you're talking about. Or do you say, good God, I am happy to get it off my chest. It was this guy and this happened and that happened. He attempted to avoid anything to do with this case by telling the police nothing at first. Only when it became apparent that the police had evidence that he was in the park did he finally acknowledge that. And then he comes up with a story in front of you, an oral version that was reduced to writing that was signed, as well as the videotape.

Trial Trans. pp. 823–24.

In *Doyle v. Ohio*, 426 U.S. 610, 618–19, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court ruled that a defendant's trial testimony could not be impeached with evidence that he had earlier chosen to remain silent after being advised of his *Miranda* rights. To find a violation of a defendant's rights under *Doyle v. Ohio*, a court must determine that the statement was "manifestly intended or [was] of such a character that the jury would naturally and necessarily take it" as a criticism of the defendant's decision not to speak with the authorities. *United States v. Araujo*, 539 F.2d 287, 292 (2d

Cir.1976); *accord United States v. Pitre,* 960 F.2d 1112, 1124 (2d Cir.1992). That is not this case.

When the challenged remarks are reviewed in context, it is apparent that such statements as "Only he knows nothing," and "He attempted to avoid anything to do with this case by telling the police nothing at first," were not intended to urge an adverse inference from Hernandez's exercise of his right to remain silent. Rather they were comments on his willingness to lie after having waived his right to remain silent. Detective Ingwersen testified that Hernandez expressly agreed to speak with the police after being advised of his rights. When asked what he knew about the Seri murder in Highland Park, Hernandez did not exercise his right to remain silent. He replied that he knew nothing and had never been in the park. Only when told that eyewitnesses had seen him there did he change his story. The right to remain silent does not include the right to make false denials. *See generally Brogan v. United States,* 522 U.S. 398, 118 S.Ct. 805, 810, 139 L.Ed.2d 830 (1998) (rejecting "exculpatory no" defense to prosecutions under 18 U.S.C. § 1001). Thus, due process was not infringed by the prosecution argument that petitioner, after advice and waiver of rights, initially lied about his presence in Highland Park and then tailored his testimony to fit the disclosed evidence. *See Anderson v. Charles,* 447 U.S. 404, 409, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (ruling that *Doyle* does not prevent a prosecutor from commenting on defendant's inconsistent statements); *accord Gatto v. Hoke,* 809 F.Supp. 1030, 1036 (E.D.N.Y.1992) (summation highlighting the implausibility of contradictory and inconsistent post-arrest statements by defendant was not an impermissible comment on his right to remain silent).

**\*23** Nothing in the prosecution summation denied Hernandez a fundamentally fair trial. This aspect of his due process challenge is rejected as procedurally barred and without merit.

### G. *Misconduct by Detective Joseph Ponzi*
Hernandez asserts that Joseph Ponzi, a detective assigned to the Kings County District Attorney's office, promised to have the Seri murder charges dismissed if Hernandez followed his instructions with respect to a federal investigation into the allegedly corrupt activities of a Queens County Assistant District Attorney. [4] When this claim was raised in Hernandez's § 440.10 challenge to his 1994 conviction, the state court denied relief on the procedural ground that Hernandez had failed to raise the point on direct appeal.

Accordingly, this court is barred from addressing the merits of the defaulted claim unless Hernandez can show good cause to excuse his omission and ensuing prejudice, or demonstrate actual innocence. Once again, petitioner cannot satisfy this standard because his claim lacks merit.

Preliminarily, the court notes that Hernandez has failed to adduce any evidence beyond his own self-serving statement to support the claim. If Detective Ponzi had made any promises, one would have expected Hernandez to have related the particulars to his attorney or, given petitioner's volubility, to the trial court. [5] But even assuming arguendo that the officer had promised to dismiss a murder charge in return for petitioner's cooperation or silence, the promise would not have been enforceable. "Promises made during plea-bargaining and analogous contexts" can only be enforced if (1) the government agent is "authorized to make the promise;" and (2) the defendant "rel[ies] to his detriment on the promise." *United States v. Streebing,* 987 F.2d 368, 372 (6th Cir.1993); *accord United States v. Kettering,* 861, F.2d 675, 677–78 (11th Cir.1988); *Johnson v. Lumpkin,* 769 F.2d 630, 633–34 (9th Cir.1985); *United States v. Chapel,* 1995 WL 274387, at *4 (S.D.N.Y. May 9, 1995) (quoting *United States v. Streebing* at length). Petitioner cannot satisfy either requirement of this test.

He has failed to show that Detective Ponzi or any police officer had authority to make promises regarding charges voted by a grand jury. *Cf. United States v. Kettering,* 861 F.2d at 678 (plea agreement unenforceable where DEA agent negotiated the agreement without authority from the United States Attorney); *United States v. Hudson,* 609 F.2d 1326, 1329 (9th Cir.1979) (secret service agent's promise to drop federal counterfeit charges in exchange for defendant's cooperation was unenforceable where the promise was clearly outside the agent's authority). Further, Hernandez has not even alleged, much less proffered evidence, demonstrating that he relied to his detriment on the purported promise. [6]

Even if petitioner could satisfy these two elements, no court would be inclined to dismiss criminal charges absent extraordinary circumstances. *See United States v. Fields,* 592 F.2d 638, 647–448 (2d Cir.1978) ("It is only in the rare case, where it is impossible to restore a criminal defendant to the position that he would have occupied vis-a-vis the prosecutor, that the indictment may be dismissed"). At most, Hernandez might have been entitled to suppression of any statements induced by the alleged promise. *See id.* ("Even

when a prosecutorial arm of the government unlawfully obtains evidence, we normally limit the permissible sanction to suppression of the illegally obtained evidence"); *cf.Green v. Scully*, 850 F.2d 894, 900–901 (2d Cir.1988) (a confession induced by a promise of help or leniency may be suppressed if the promise, together with other circumstances, made the confession involuntary). Because Hernandez cannot point to any evidence disclosed to Ponzi that was actually used against him at the Seri murder trial, he cannot show that his conviction for that crime was obtained in violation of any federal right.

**\*24** Accordingly, this claim is rejected both as procedurally barred and without merit.

### H. *Ineffective Assistance of Counsel*
Hernandez submits that he was denied the effective assistance of counsel at his 1994 trial in that his attorney failed to (1) make use of the tape recorded conversation between Ernesto Diaz and a former counsel, (2) show that the victim autopsy report was inaccurate, and (3) show that statements in a police report established his innocence. The court has already discussed the first contention and concluded that counsel cannot be faulted for failing to pursue a strategy fraught with risks. *See* Section II.D., *supra.*A review of the latter two claims in light of the standards set forth in *Strickland v. Washington*, 466 U.S. at 687, 694, shows that they are also lacking in merit.

Apparently, the autopsy report on Santiago Seri also refers to another decedent found in Highland Park on the same day. Hernandez submits that his attorney was constitutionally ineffective for not bringing this fact to the jury's attention. The argument is frivolous. Neither the discovery of another body nor the fact that both victims were discussed in a single autopsy report would have assisted in the defense of Hernandez's case. Certainly, counsel had no reason to challenge the prosecution's evidence as to the location of Seri's body in the park or the nature of the gunshot wound that killed him. Four eyewitnesses provided consistent testimony on these points. These were Rachel DeJesus, who participated in the crime; Darrell Dotson, the disinterested park witness who found Seri's body; and two police officers who responded to the crime scene. In any event, in his post-arrest statement, Hernandez made plain that Seri was the only victim in the station wagon he drove to Highland Park. His statement also confirmed that Seri was shot at close range. Indeed, defense counsel made the strategic decision to rely on and emphasize that portion of the medical examiner's findings indicating that

Seri had been shot with a gun placed almost directly on his right cheek. He argued that this showed that the shooter had to have been someone sitting next to Seri in the back seat, and not Hernandez, who had been driving the car. This reasonable strategy precludes a finding of ineffective assistance.

Hernandez further faults counsel for not impeaching prosecution witnesses with a statement in the police report of a "Sergeant Mahler," which purportedly indicates that there were three people in the beige station wagon in addition to Santiago Seri.

The conduct of cross-examination is generally left to the sound judgment of counsel. A reviewing court "on a cold record should not second-guess [counsel's] decisions unless there is no strategic or tactical justification for the course taken."*United States v. Luciano*, 158 F.3d 655, 659 (2d Cir.1998). That is not this case. Preliminarily, the court notes that Hernandez has not supplied a copy of the Mahler report to this court. The omission is not insignificant, since the respondent apparently disputes the existence of any report by a "Sergeant Mahler." In any event, the court does not understand Hernandez to be claiming that Mahler could have provided direct evidence of the number of people in the station wagon in addition to Seri. Rather, he appears to suggest that Mahler's report reflects a prior inconsistent statement by one of the park witnesses. Assuming arguendo that the report is as represented by petitioner, counsel may well have decided that the officer simply misunderstood the person testifying as to whether there were three people in the car including Seri or excluding Seri. After all, five witnesses—Rachel DeJesus and the four park witnesses—testified unequivocally that only two people fled the car, a man and a woman. Defense counsel had the opportunity to observe these witnesses as they testified and to assess their impact on the jury. It was well within the broad discretion afforded defense counsel to decide that any attempt to challenge any one of them on the number of people who fled the car would have been pointless. *SeeUnited States v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992) (the nature and extent of cross-examination are strategic decisions left to counsel); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987) (same).

**\*25** Because nothing in the record indicates that Hernandez was denied constitutionally effective trial counsel at his 1994 trial, the court rejects his Sixth Amendment challenge to his conviction.

### III. *The 1995 Conviction*

#### A. *Jurisdiction of the Queens County Supreme Court*
Hernandez contends that he is entitled to habeas corpus relief because the Queens County Supreme Court, where he was tried and convicted in the 1995 case, lacked personal and subject matter jurisdiction over his alleged crime. When this claim was first raised in petitioner's § 440 challenge to his 1995 conviction, it was rejected on the procedural ground that Hernandez had failed to raise it on direct appeal. This independent state law ground for rejection of the claim stands as a procedural bar to this court's consideration of the merits absent a showing of actual innocence or a demonstration of good cause for the default and ensuing prejudice. Innocence is plainly refuted by the overwhelming evidence of guilt, no good cause is apparent from the record, and the claim's lack of merit shows that no prejudice was sustained.

The claim lacks merit because a county-based jurisdictional challenge implicates no federal right. Certainly, the State of New York had both personal and subject matter jurisdiction over Hernandez and the charged crimes. How New York assigned jurisdiction among its counties was a matter of state law. In fact, N.Y.Crim. Proc. Law § 220.40(2)(d) (McKinney's 1992), provides that a county has jurisdiction where "[t]he offense committed was an attempt, conspiracy or criminal solicitation to commit a crime *in such a county*" (emphasis added). In petitioner's case, although the investigation of the charged crimes began in Kings County, and although he was formally arrested in Bronx County, there is no doubt that the murders were intended to take place in Queens County, indeed, in the vicinity of the courthouse.

Accordingly, petitioner's jurisdictional challenge is without merit under both federal and state law, as well as procedurally barred.

#### B. *Sufficiency of the Evidence*
Hernandez submits that his 1995 conviction was obtained in violation of due process because it was unsupported by sufficient evidence of guilt. Specifically, Hernandez challenges the credibility of prosecution witness Inessa Kurepina. As this court noted in rejecting Hernandez's sufficiency challenge to his 1994 conviction, *see* Section II, A, *supra,* it is the exclusive responsibility of the jury to decide the credibility of witnesses, *see Bossett v. Walker*, 41 F.3d at 830. Because this court must view the evidence in the light most favorable to the jury, *see Jackson v.*

*Virginia,* 443 U.S. at 318–19, it must assume that Ms. Kurepina was found credible, *see United States v. Allah,* 130 F.3d at 45. In any event, Ms. Kurepina's testimony was not critical to establishing petitioner's guilt. As the state court observed in rejecting Hernandez's sufficiency challenge when it was raised on direct appeal, the recorded conversations Hernandez had with fellow prisoner Alex Sokolov and with undercover Police Captain Edward Brady overwhelmingly supported his convictions for conspiracy to murder. *See People v. Hernandez,* 242 A.D.2d at 339, 661 N.Y.S.2d at 978.[7] In these conversations, Hernandez (1) demonstrates his willingness to conspire with Sokolov and the hitman "Nicholas" in a scheme to kill District Attorney Brown, ADA Warsawsky, and Justice Goldstein; (2) agrees to make a sizable cash payment in furtherance of the conspiracy; and (3) supplies "Nicholas" with details regarding the whereabouts and habits of the intended victims. This evidence plainly supported the jury's guilty verdict. The sufficiency claim is rejected on the merits.

#### C. *Competency*
**\*26** Hernandez's attorney did not request any competency examination of his client in connection with the 1995 prosecution. Nevertheless, Hernandez now asserts that due process required the trial court to order such an examination sua sponte. This argument, which was raised for the first time in petitioner's § 440 challenge to his 1995 conviction, is both procedurally barred and without merit.

The court has already discussed at some length the legal standards applicable to the issue of competency. *See* Section II.B., *supra.* A trial court enjoys considerable discretion in assessing those situations in which further inquiry is required. *See United States v. Nichols,* 56 F.3d at 414. In Hernandez's case, the trial court knew that although he had a psychiatric history, petitioner had admitted to Detective Rizzo that he feigned craziness to avoid onerous prison conditions. Moreover, the record in this case clearly shows that Hernandez was an active participant in his defense, regularly consulting with trial counsel and frequently addressing the court on his own behalf. Indeed, his own testimony demonstrates his clear understanding of the proceedings and the charges against him.

What the record also shows is Hernandez's total disrespect for the criminal justice system. His offensive challenges to the authority of the court earned him five contempt citations at trial and a sixth at sentencing. At sentencing,

Hernandez boldly engaged in a chilling, though quite lucid, obscenity-laced verbal attack on the prosecutors and the judge, promising to see them again and threatening to make them suffer. *See* Sentencing Trans. pp. 19–37. The trial judge showed remarkable patience throughout this episode, which this court views as far more reflective of petitioner's incorrigibility than any legal incompetence.

This aspect of petitioner's due process challenge to his conviction is rejected as both procedurally barred and without merit.

### D. *Tape Recorded Conversations between Hernandez and Sokolov*

Hernandez asserts that the recorded conversations between himself and Alex Sokolov should not have been received in evidence since they were obtained in violation of the Fourth, Fifth, and Sixth Amendments. The claim, which was not raised on direct appeal, was found procedurally defaulted by the state court hearing Hernandez's § 440 motion. In the absence of any showing of actual innocence, or both good cause to excuse the default and ensuing prejudice, the state court ruling bars review by this court. Even if the procedural bar could be cleared, however, the claim would have to be rejected as without merit.

The court first addresses petitioner's Fourth Amendment challenge to the tapes. Preliminarily, it notes that the Supreme Court has erected a substantial barrier to federal habeas review of Fourth Amendment claims. In *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), it ruled that:

> [W]here the state has provided an opportunity for full and fair litigation of the Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

**\*27** *Id.* at 481–82.In this case, New York plainly afforded Hernandez the opportunity for full and fair litigation of any Fourth Amendment challenge to the tape recordings. Section 710 of the New York Criminal Procedure Law (McKinney's 1998), permits a criminal defendant to file a pre-trial motion to suppress any evidence obtained in violation of the Fourth

Amendment. *See*McPhail v. Warden, Attica Correctional Facility, 707 F.2d 67, 69 (2d Cir.1983).

In any event, Hernandez fails to demonstrate any Fourth Amendment violation in his case. The government does not engage in a constitutionally unreasonable search and seizure when it tape records conversations with the consent of one participant. *See*United States v. White, 401 U.S. 745, 753, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) ("Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police"). Thus, Sokolov's consent to the recording of his prison conversations with Hernandez obviated the need for any court order.

Similarly, Hernandez's Fifth Amendment claim must be rejected in light of the Supreme Court's decision in *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). In that case, the defendant made incriminating statements to an undercover officer posing as a fellow inmate. The Court ruled that the conversation was not obtained in violation of the Fifth Amendment privilege against self incrimination: "Ploys to mislead a suspect or lull him into a false sense of security" are permissible as long as they "do not rise to the level of compulsion or coercion."*Id.* at 297;*accord*United States v. Holmes, 44 F.3d 1150 (2d Cir.1995) (relying on *Illinois v. Perkins* in rejecting defendant's challenge to government's use of a third-party to tape record incriminating conversations). In an effort to establish "compulsion or coercion" in his case, Hernandez notes that his conversations with Sokolov took place in a psychiatric ward when he might have been using drugs. In fact, petitioner's own trial testimony indicates that there was no coercion. He testified that he made the incriminating statements in order to help Sokolov obtain a reduction in sentence in return for which he expected Sokolov to help plan his escape. This raises a question as to whether Hernandez meant what he said on the tape, an issue resolved against him by the jury. It does not, however, evidence government compulsion or coercion in violation of the Fifth Amendment.

Hernandez also challenges the tape recordings on the grounds that they were obtained in violation of his Sixth Amendment right to counsel. He is wrong."[T]he Sixth Amendment right to counsel does not attach until after the initiation of formal charges."*Moran v.. Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). When the Sokolov tape recording was made, Hernandez had not yet been indicted for his efforts to kill the prosecutors and judge in his 1994 case.

Hernandez v. Senkowski, Not Reported in F.Supp.2d (1999)

1999 WL 1495443

Petitioner submits that the Supreme Court's decision in *Maine v.. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), somehow supports his Sixth Amendment claim. Petitioner misreads that case. In *Maine v. Moulton,* the Court "considered the constitutional implications of a surreptitious investigation that yielded evidence pertaining to two crimes. For one, the defendant had been indicted; for the other, he had not."*Moran v. Burdine,* 475 U.S. at 431 (discussing *Maine v. Moulton* ). As to the indicted charges, the Court ruled that the Sixth Amendment barred the government from using incriminating statements obtained in the absence of counsel at the trial of the indicted charges. But as to any unindicted charges, the Court ruled that "incriminating statements pertaining to [those] crimes "are, of course, admissible at a trial of those offenses."*Maine v. Moulton,* 174 U.S. 180 & n. 16.

*\*28* Because Hernandez's conversation with Sokolov regarding the intended murders of various persons involved in his 1994 case occurred before he was ever indicted for those crimes, the prosecution did not violate the Sixth Amendment by tape recording that conversation without notice to counsel. *SeeAlexander v. State of Conn.,* 917 F.3d 747, 751 (2d Cir.1990) (following *Maine v. Moulton* in finding no Sixth Amendment violation when a defendant charged with arson admitted an uncharged murder to a confidential informant).

For all these reasons, Hernandez's various challenges to the Sokolov tape recording are rejected as procedurally barred and without merit.

### E. *Inaccuracy of Trial Transcript*
Hernandez contends that the transcripts of his 1995 trial are "seriously inaccurate" and, indeed, "falsified," thereby denying him due process of law. He submits that the trial court should have ordered a hearing to reconstruct an accurate trial record. The argument is procedurally barred and, in any event, without merit. Hernandez's argument is totally conclusory. He has never identified for the state court or this court any specific inaccuracy in the trial record. Neither has he ever indicated how he has been prejudiced by any inaccuracy. This court, having read through the trial record, has found no instance in which the transcript differs materially from Hernandez's own summary of what occurred at trial. Under these circumstances, the court rejects this due process challenge to the 1995 conviction as procedurally barred and without merit.

### F. *Prosecutorial Misconduct*
Hernandez asserts that the prosecutor violated his right to due process when he impermissibly elicited from Detective Rizzo the fact that Hernandez remained silent when arrested and later, upon seeing a portrait of District Attorney Richard Brown, uttered an obscenity. These claims are procedurally barred and, in any event, without merit.

Detective Rizzo's testimony regarding his post-arrest encounter with the defendant is reported at pp. 59–62 of Vol. 2 of the trial transcript. The prosecutor never questioned the witness about Hernandez remaining silent. Instead, he pointedly asked "did there come a point in time when the defendant made some statements to you?"Trial Trans., Vol. 2, p. 59. When the witness acknowledged that Hernandez had made statements, the prosecutor asked him to recount what was said. The detective testified that Hernandez was screaming curses at Richard Brown and the undercover officer who had posed as "Nicholas." He also demanded the return of his $5,000. *Id.* at 60.Later, he volunteered that he often feigned craziness. When photographed, he made an obscene hand gesture and stated that it was directed toward Richard Brown. *Id.* at 61–62.This testimony in no way commented on petitioner's right to remain silent. Neither was it unduly prejudicial. Proof of Hernandez's intense animus toward those who would prosecute him for criminal conduct was relevant to his motive and intent on the charged crimes.

*\*29* Because the record fails to evidence any prosecutorial misconduct, this aspect of Hernandez's habeas petition must be denied.

### G. *Ineffective Assistance of Counsel*
Hernandez complains that trial counsel was constitutionally ineffective in that he failed to move (1) to change venue, (2) for a competency hearing, (3) to reconstruct the trial record, and (4) for recusal of the trial judge. [8] These claims were held procedurally barred when first raised in connection with Hernandez's § 440 motion. They are similarly barred from review by this court. Even if that were not the case, petitioner would not be entitled to relief since he cannot satisfy the standards set forth in *Strickland v. Washington,* 466 U.S. at 687, 694. The court has already discussed the lack of merit in Hernandez's first three claims of attorney error. Plainly, petitioner was not prejudiced by his attorney's failure to raise claims that could not succeed.

Hernandez v. Senkowski, Not Reported in F.Supp.2d (1999)

1999 WL 1495443

As for petitioner's claim that counsel was constitutionally ineffective in failing to move for Justice Cooperman's recusal, Hernandez cannot show that he was prejudiced since (1) such a motion was not likely to have been granted, (2) there is no reason to think that trial before another judge would have yielded any more favorable result for petitioner.

The Supreme Court has long held that "most matters relating to judicial qualification [do] not rise to a constitutional level."*FTC v. Cement Institute,* 333 U.S. 683, 702, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); *accordAetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 820, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). While due process does require a judge with a "direct, personal, substantial, pecuniary interest" in the result of a case to recuse himself, *seeTumey v. Ohio,* 273 U.S. 510, 513, 47 S.Ct. 437, 71 L.Ed. 749 (1927), "matters of kinship, personal bias, state policy, [and] remoteness of interest, would seem generally to be matters merely of legislative discretion,"*id.* at 523.In this case, Hernandez complains that Justice Cooperman should not have presided over his 1995 case because he was friendly with Justice Goldstein, the person whom petitioner was charged with conspiring to murder. Since this is a claim of personal bias rather than direct or pecuniary interest, it is controlled by state rather than federal constitutional law.

New York Judiciary Law § 14 (McKinney's 1983), sets forth those limited circumstances in which a judge must recuse himself, specifically, (1) where he is a party or attorney in an action, or (2) where he is related by a specified degree of consanguinity to a party. The fact that a judge has a "close personal relationship" with persons involved in a case does not trigger the automatic recusal provisions of § 14. *SeeKurz v. Justices of the Supreme Court of N.Y.,* 228 A.D.2d 74, 654 N.Y.S.2d 783, 784 (2d Dep't 1997). In such circumstances, the judge "is the sole arbiter" of whether any bias or appearance of bias requires recusal. *People v. Moreno,* 70 N.Y.2d 403, 405, 521 N.Y.S.2d 663, 665, 516 N.E.2d 200 (1987); *seePetkovsek v. Snyder,* 251 A.D.2d 1086, 674 N.Y.S.2d 208, 209 (4 th Dep't 1998) (where recusal is not statutorily required under § 14, the matter "is addressed to the discretion and personal conscience of the Justice whose recusal is sought").

**\*30** As a general rule, judges do not recuse themselves simply because they will have to review the rulings of their friends and colleagues on the bench. *SeeUnited States v. Cutler,* 796 F.Supp. 710, 714 (E.D.N.Y.1992) (holding that judges of Eastern District were not required to recuse

themselves under 28 U.S.C. § 455(a) from presiding over a charge of criminal contempt for willful violation of the orders of a colleague). Judges well understand that their first duty is to their oaths to administer justice fairly and impartially without regard to person. There is "no reason" to conclude that any judge would hesitate to honor this duty simply because a case involved a colleague. *SeeUnited States v. Colon,* 961 F.2d 41, 44 (2d Cir.1992) (summarily rejecting suggestion that Circuit Court would be reluctant to reverse the district court rulings of a recently-elevated colleague); *see alsoPeople v. Bibbs,* 177 A.D.2d 1056, 578 N.Y.S.2d 297 (4 th Dep't 1991) (holding that Niagara County Court judge did not abuse discretion in declining to recuse himself from burglary case in which court's chief clerk was victim).

The same logic necessarily pertains to cases in which judicial colleagues are sued civilly or in which they are the alleged victims of criminal conduct. In sum, since neither federal nor state law required recusal in Hernandez's case, counsel cannot be faulted for failing to make a motion so unlikely to be granted.

Neither can Hernandez show that he would have received a fairer or more favorable trial before any other judge. The state court record amply reflects Justice Cooperman's diligent protection of Hernandez's rights throughout the pretrial, trial, and sentencing proceedings, and his patient endurance of petitioner's offensive conduct. In sum, Hernandez was not prejudiced by any purported judicial bias. The reason for his conviction was singular: overwhelming evidence of guilt.

In all respects, the claim of ineffective assistance of counsel is found to be without merit.

*Conclusion*

For the reasons stated, the court finds that most of Hernandez's federal challenges to his 1994 and 1995 state convictions are procedurally barred from federal review. In any event, all challenges raised to these convictions are without merit. The court hereby denies both petitions for writs of habeas corpus. Similarly, it denies certificates of appealability. The Clerk of the Court is to docket a copy of this memorandum and order in both captioned case files and to mark each case closed.

*SO ORDERED.*

1999 WL 1495443

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 1495443

**Footnotes**

1    On the earlier case, respondent is represented by the Queens County District Attorney, who prosecuted Hernandez for the Seri murder. On the later case, respondent is represented by the Bronx County District Attorney, who had been appointed Special Prosecutor on the 1995 charges.

2    In rebuttal, the prosecution called Justice Goldstein, who testified that on the afternoon of November 17, 1994, he picked up his chambers phone and heard someone say, "Goldstein?" When the judge asked the caller to identify himself and his business, a string of obscenities ensued. As Justice Goldstein hung up, he realized that the caller was petitioner, whom he had sentenced only a few weeks earlier.

3    The record indicates that at some point prior to trial, the court was provided a copy of the conversation between defense counsel and Ernesto Diaz.

4    It is not always clear from Hernandez's submissions in this court and in earlier filings in the state court whether he is complaining that Ponzi was soliciting his silence or his assistance in the purported federal probe.

5    In opposing Hernandez's § 440.10 motion, the District Attorney noted that Detective Ponzi did meet with Hernandez who purported to have information of value to the authorities. Not long into their meeting, the detective concluded that Hernandez was not credible. Thus, no cooperation agreement was ever reached, much less an agreement to dismiss criminal charges.

6    Where a defendant's reliance on an unauthorized promise is so detrimental that it renders a prosecution "fundamentally unfair," courts may possess inherent discretionary power to enforce the agreement. See United States v. Williams, 780 F.2d 802, 803 (9 th Cir.1986) (citing United States v. Rodman, 519 F.2d 1058, 1059–60 (1 st Cir.1975) (trial court did not abuse its discretion in dismissing an indictment on the grounds that the Securities and Exchange Commission broke a promise to "strongly recommend" against prosecution in exchange for extensive inculpatory statements)). As noted above, petitioner fails to allege any detrimental reliance, much less the degree of reliance that might render his prosecution "fundamentally unfair."

7    Since New York State follows a unilateral rather than bilateral approach to the crime of conspiracy, a defendant may be found guilty of the crime even where his only confederate lacks criminal intent, i.e., where the alleged coconspirator is a police officer or government cooperator. See United States v. Lombardozzi, 620 F.Supp. 587, 589 (E.D.N.Y.1985) (and law and cases cited therein).

8    In his reply brief to this court, Hernandez raises for the first time complaints about his trial counsel's failure to investigate potential witnesses, do legal research, review trial testimony, and familiarize himself with various documents. These claims are clearly unexhausted and, at this point, procedurally barred. Further, they are presented to this court without any evidentiary proffer or explanation of how Hernandez believes he was prejudiced by the alleged errors. This court declines to review procedurally barred claims raised so conclusorily in a reply submission. See generally Matura v. United States, 875 F.Supp. 235, 237–38 (S.D.N.Y.1995) ("Petitioner's bald assertion that counsel should have conducted a more thorough pretrial investigation fails to overcome the presumption that counsel acted reasonably").

**End of Document**         © 2015 Thomson Reuters. No claim to original U.S. Government Works.